[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 157 
Appellant, Tommy Hamilton, was indicted by the Grand Jury of Lawrence County for the murder of Lehman Wood during the course of a robbery, a capital offense pursuant to § 13A-5-40(a)(2), Code 1975. He was subsequently convicted and was sentenced by the trial court, as recommended by the jury, to death by electrocution.
The record indicates that appellant was initially apprehended on the basis of information provided to Investigator James Farris by Randall Curry and Randy Mitchell. Curry testified at trial that he got off from work at approximately 5:00 p.m. on July 11, 1984, and that he and Randy Mitchell, a co-worker, drove south down Highway 33 to go to a bootlegger's house located "up the mountain" in the Bankhead National Forest. At the intersection of Highway 33 and Ridge Road he observed a blue Ford Maverick automobile stopped on the "cutoff road." An examination of photograph exhibits of the scene reveals that this cutoff road is a short spur off Ridge Road just as it intersects Highway 33. Because Ridge Road intersects at such a sharp angle to Highway 33, this cutoff was put in so that drivers heading south on Highway 33 would not have to negotiate an extremely sharp, apparently about 135 degree, turn to their right to get onto Ridge Road. Curry observed a woman sitting in the driver's seat of the blue Maverick, a woman sitting in the front passenger seat, and a child sitting in the back seat.
Curry and Mitchell went to the bootlegger's house and then left, traveling back to Highway 33 on Ridge Road. When they reached the road they again noticed the Maverick with the same occupants. Curry then turned onto Highway 33, heading north. They passed Lehman Wood, who was driving south. Soon after passing Wood, they decided that they wanted to turn around and head back into the forest to a hunting camp near the bootlegger's house.
After they turned around and headed south, they met the blue Maverick going north on Highway 33. It now, however, had three adults in the front seat. When they arrived at the cutoff, they found Lehman Wood's truck and then discovered his body and realized that he had been shot. They flagged down a passing motorist to send for law enforcement officers.
When Investigator Farris arrived at the scene, Curry described the Maverick and its occupants. From this description Farris determined that the persons in the car were Tommy Hamilton, Janice Glasco, and Debbie Hamilton. An all-points bulletin was issued on the Maverick and its occupants. At 7:00 p.m., police officers in Trinity located the car and its occupants at a convenience store. Appellant and Debbie Hamilton were observed using the phone. Backups were called, and appellant, his wife Debbie Hamilton, and his sister Janice Glasco, were arrested. Also in the car was Janice Glasco's seven-year-old son Jason.
When officers were placing the appellant and his wife in separate cars to be transported to the Lawrence County jail, appellant yelled to his wife, "Don't tell them a damn thing. Don't answer any questions."
Testimony was given which indicated that the victim was in the habit of carrying with him a quantity of money. He was observed the day before his murder and the day of it with a large roll of money, which included some $100 bills. When his body *Page 158 
was searched, there was only some change in a front pocket.
A search of Janice Glasco's purse after her arrest revealed $226.00, which included two $100 bills. A search of Debbie Hamilton revealed ten $100 bills and one $50 bill. Appellant had one $100 bill.
Bloodstains consistent with the victim's blood type were found on the Maverick, on a bloody T-shirt found in the Maverick, and on the denim jeans worn by Debbie Hamilton.
Officers at the Lawrence County jail spoke to Jason Glasco and he directed them to the residence of Lucille Hamilton, appellant's mother. There, appellant's mother signed a consent-to-search form. Jason then led officers to a log, in some woods behind the house, under which was found a .30-30 rifle and a box of 30-30 ammunition.
A bullet derived from a test firing of this rifle was compared with a bullet found near the victim, and it was determined that both bullets were fired from a rifle with the same barrel characteristics. The bullet found at the scene, the bullet used in the test firing and the box of ammunition found with the rifle were all of the same brand of ammunition.
The victim died of a .30-30 gunshot wound to the neck and one to the chest. It was established that either wound would have been fatal. The .30-30 rifle which was found contained six rounds but when it was fully loaded would hold eight rounds.
At 5:00 p.m. on the date of his murder the victim had stopped at Smother's Store, south of Moulton. There he spoke to retired minister Jewel Dutton. He told Dutton that "Janice and them had had some car trouble up on the mountain," and that they had called him and wanted him to go out there.
Jimmy Dale Owens, a trusty at the Lawrence County jail, testified that while appellant was awaiting trial appellant confided in him that:
 ". . . When he got out of the truck I shot him. I shot him in the neck. It was a damn good shot, wasn't it?"
He also testified that appellant told him that after he shot the victim he had his wife and Janice Glasco drag the body out of the way. Appellant also said that Janice told him that she did not believe he was dead so he shot him again to make sure he was dead. Appellant told Owens that "The son-of-a-bitch deserved dying" and that he would do it again.
This testimony was supported by State's photograph exhibits which clearly show a blood trail where the victim was dragged across the road. The photographs also show blood splatters going up the grill of the truck, clearly indicating that the victim was in fact shot the second time after he was dragged across the road to the front of his truck.
At trial appellant took the stand in his own defense. His testimony established that he worked for the victim and that his sister dated the victim. On the day in question he did not go to work. He was drinking and taking pills and riding around with his sister, his wife, and his sister's son, Jason. He stated that he had some guns in the trunk of his automobile that he intended to sell and that he also had some beer in the trunk. He testified that his sister Janice called the victim because she wanted to spend the afternoon with him at Brushy Lake and have a few beers. They were to meet the victim at Ridge Road. Appellant testified that when they got to Ridge Road he hid the guns in the woods because he did not want the victim to ask for a beer and see the guns in the trunk. Appellant was on probation and he was afraid that the victim would turn him in.
Appellant testified that when the victim arrived, they got into an argument over what the victim had paid appellant when appellant had done work for him in the past. According to appellant, the victim told him that "a sorry son-of-a-bitch like you don't deserve no more." Then suddenly, according to appellant, the victim said, "I'll kill you" and put his hand in his pocket. Appellant testified that he ran into the woods, picked up the rifle, and shot the victim. He, however, could not recall shooting him a second time. *Page 159 
Appellant now appeals from his conviction and sentence of death.
 I
Appellant contends that he was denied due process because the State failed to disclose certain evidence which he believes was exculpatory.
The first instance he complains of was that the State failed to disclose inconsistent statements made to the district attorney's investigator by Jason Glasco concerning the actions of appellant immediately prior to the death of Wood. Jason gave five interviews to Investigator Ed Weatherford of the district attorney's office. The first of these statements was taken the morning after the killing. It was as follows in the wording of Investigator Weatherford:
 "Tommy shot Lehman twice. Debbie drug across road took money from Leman gave it to Tommy. Debbie got blood on her feet. She used Tommy's Budwiser shirt to pull him. Tommy was hiding in the woods he shot Leman once then shot him again. Mom, Debbie and Tommy were riding around in Mom's Lt. Blue Ford Maverick. Debbie had called Leman from a pay phone and told him to meet us in the Forrest. Me, Momma, Debbie, and Tommy rode to where you go hunting. Tommy got out of the car and hid in the woods. Leman drove up, Debbie told Leman the car was broke down. When Leman started to open the hood Tommy shot Leman. Debbie drug Leman across the road with Tommy's Budwiser shirt. She then got the money from Leman and gave it to Tommy. Debbie drove us off. We went to my Grandma Hamilton's house where Tommy hid the gun just across the fence. Debbie hid the Budwiser shirt there, too. Mama begged Tommy not to shoot Leman."
His second interview corresponded with the first interview. The third interview was taken on August 6, 1985. In it Jason stated:
 "Well when we got up there Lehman drove up and he and Tommy had an argument and Tommy was afraid that he had a gun so Tommy went and shot him."
At the time of this interview Jason was living with his mother, who was out on bail. After the statement was made, Investigator Weatherford questioned him further and he acknowledged that this new version was a lie. This was the only time prior to trial that Jason's statement materially varied. At trial, however, Jason's testimony was corroborative of appellant's and corresponded with that portion of his third statement that he had acknowledged was a lie.
Pursuant to United States v. Bagley, 473 U.S. 667,105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), undisclosed evidence is material under the Brady rule (Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)) only when it is reasonably probable that the outcome of the trial could have been different had the evidence been disclosed to the defense. Due to Jason's trial testimony, which corresponded with and supported appellant's version, we are unable to determine any conceivable way that the disclosure of this one statement, which was immediately recanted, could alter the result of this trial.
Appellant also contends that the State failed to give him a statement from Jason in which he said that prior to the shooting the appellant had gone to the residence of appellant's uncle in an unsuccessful attempt to sell the guns (plural) in the trunk. The appellant first learned of this statement during voir dire examination of Investigator Weatherford. Appellant contends that this information would have tended to show that he did not formulate a plan to ambush the victim, because, he says, if he had done so, he would have attempted to sell the guns after the victim was called to the scene. We note that Jason testified fully to this event at trial. The jury was free to evaluate that information and assign it whatever weight they thought it should be accorded. Upon application of theBagley test we do not find that the result of the trial could have varied had this information been given to appellant prior to trial. Furthermore, we note that the jury may have considered the *Page 160 
fact that Jason at trial merely stated that they attempted to sell "the gun" (singular) and that the evidence indicated that he had both a shotgun and a rifle in the trunk of the car.
Appellant next contends that the State did not disclose a statement obtained from Judy Woodard, who lived near the scene of the crime, which conflicted with the statement given by Jason regarding the sequence of events following the first shot.
Judy Woodard told Investigator Weatherford that she heard two shots and then the sound of a loud muffler noise of a car starting up. Appellant contends that this was directly "contrary to Jason's first statement that as they proceeded to leave in the car, presumably after the car was started, that Hamilton shot Wood the second time." (Emphasis added.) This presumption on the part of the appellant is not clearly supported by the evidence.
Investigator Weatherford, referring to notes he made of Jason's statement, summed up the relevant portion of Jason's statement as follows:
 ". . . The body was drug out from in front of the car. Debbie got the money, they proceeded to leave.
That Janice said, 'He can't be dead,' and at that Tommy said, 'I'll make sure the motherfucker's dead,' shot him again in front of his truck, then they left." (Emphasis added.)
It appears that appellant's presumption as to what Investigator Weatherford meant by the statement "proceeded to leave" is unfounded. "Proceeded to leave" could clearly also mean that they prepared to leave, meaning they got in the car, etc., but had not yet started it. The appellant again attempts to find aBrady violation where there clearly is none. We cannot conceive of any way the trial result would have varied had Woodard's statement been given to appellant prior to trial. Bagley, supra.
Appellant next contends that the State did not disclose that its investigators had determined that Patricia Alexander, a store clerk at Smother's Grocery, did not remember seeing the victim on the afternoon of the killing. Appellant contends that this would directly contradict Reverend Jewel Dutton's testimony in which he stated that he saw the appellant around 5:00 p.m. at the store on the day of the killing, that the victim bought a Coca-Cola and a pack of cigarettes, and that he said, "Janice and them" had called him to come help with their broken down car "on the mountain." When questioned as to whether Lehman Wood had bought anything from her that afternoon, the following occurred:
 "Q. Lehman Wood, that afternoon, did he buy anything from you?
"A. I don't know. I don't remember.
"Q. Now —
 "A. I don't even remember seeing him out there that evening."
She also testified that she told an investigator this same fact a short time after the shooting.
Here again, it is not clear whether the fact that this store clerk did not "know" or could not "remember" whether the victim had been in the store could be considered exculpatory. At any rate, the subject was thoroughly covered at trial and the jury was able to weigh Alexander's testimony against that of Dutton. Again we find no violation of the Bagley rule, because it is clear that the result of the trial would not have varied if the appellant had been provided this information prior to trial.
Appellant's contention that Reverend Dutton's testimony was "clearly perjured" because he mistakenly testified that Smother's Grocery closed at 5:00 p.m. has no merit. Testimony was received regarding the unusual and widely varying opening and closing hours per each day of the week of the grocery and the attached lawnmower shop. We see no reason to list those here, but note only that it is clear why Reverend Dutton could have been confused. In any event his mistaken testimony is in no way a clear indication of perjury.
 II
Appellant contends that the trial court erred in finding that Jason Glasco was competent *Page 161 
to testify. Upon Jason's taking the stand initially, the following exchange occurred:
"Q. Where was it that Lehman was killed?
"A. I don't want to testify.
"Q. When did you decide not to testify?
 "A. I just don't want to testify. Every time I try to tell you the truth, you tell me I'm telling a lie.
 "Q. I have never told you that you were telling a lie.
"A. Yes, you did and —
 "COURT: Son, you don't have that choice. You have to tell what you know about the case.
 "A. Well, every time I tell Tim Littrell, he tells me I'm telling a lie and then he —
"COURT: Well, you just —
 "A. I don't even know what the truth is. He keeps telling me I'm telling a lie."
"(WHEREUPON WITNESS BEGINS TO SOB HEAVILY)"
The court then allowed the witness to step down. Upon his return to the stand, Jason testified to a version not unlike that of appellant.
We note that from the day after the shooting, when he gave his first statement, until the trial, Jason's story changed remarkably. We note also that appellant had lived with his mother, Janice Glasco, from November 1984 until the trial in May 1985.
A careful review of the record reveals that Jason did understand the nature of his oath and that he was to tell the truth. Prior to his testimony, the court examined Jason regarding his understanding of the proceeding and his knowledge of what it meant to tell the truth, as required by § 12-21-165, Code 1975. The trial court is in the best position to examine the child's demeanor and has discretion in determining if he was competent to testify. Stephens v. State, 451 So.2d 402
(Ala.Cr.App. 1984); Taylor v. State, 408 So.2d 551
(Ala.Crim.App. 1981), cert. denied, 408 So.2d 555 (Ala. 1982); Robersonv. State, 384 So.2d 864 (Ala.Cr.App.), cert. denied,384 So.2d 868 (Ala. 1980). We find no abuse of that discretion here. Furthermore, we note that the substance of Jason's testimony was, in fact, favorable to the appellant.
 III
Appellant contends that the trial court erred in allowing the State to impeach the testimony of Jason Glasco.
When Jason first took the stand, it immediately became apparent that his testimony would be adverse. He stated that each time he attempted to tell the truth the prosecutor told him he was telling a lie. Soon thereafter he became emotional and had to leave the stand.
When Jason took the stand the second time, the first questions directed to him by the State were in regard to a previous statement he had made to investigators. Objections were immediately interposed to those questions, prior to any answer by Jason. The first question the State asked Jason regarding events the day of the murder was:
 "Q. Jason, was Tommy up in the woods and shot Lehman when he drove up in the truck?
"A. No."
Although the question was leading, Jason immediately gave a response favorable to appellant. At this point it became very clear that Jason was indeed an adverse witness. The State, thereupon, attempted to impeach Jason with regard to his earlier statement.
When the testimony of a witness is adverse to the party who called the witness, it is proper for the trial court to allow that party, either for the purpose of proving surprise or to refresh the witness's recollection, to question the witness regarding prior inconsistent statements. Bell v. State,466 So.2d 167 (Ala.Cr.App. 1985); Walker v. State, 416 So.2d 1083
(Ala.Cr.App. 1982); Dennard v. State, 405 So.2d 408
(Ala.Cr.App. 1981); see also C. Gamble, McElroy's AlabamaEvidence, § 165.01(7)(a) (3d ed. 1977). Ordinarily, a suggestion by counsel that he is surprised by the testimony of his own witness is a sufficient basis for the trial court to allow the counsel to elicit testimony regarding the prior inconsistent statement. Junior v. *Page 162 State, 411 So.2d 850 (Ala.Cr.App. 1981); Dennard, McElroy's, § 165.01(7)(c).
Here we find that the State was genuinely surprised by the testimony of its own witness and we conclude that the trial court did not err in allowing the State to attempt to impeach the testimony.
 IV
Appellant next contends that the trial court erred when it denied his motion for acquittal, arguing that the State had failed to prove its case beyond a reasonable doubt. Specifically, he contends that the State failed to prove the aggravating element of robbery.
We note at the outset that in determining the sufficiency of State's evidence to support a conviction, this court must accept as true the evidence introduced by the State, must accord the State all legitimate inferences from the evidence, and must consider the evidence in a light most favorable to the State. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App.), affirmed, 471 So.2d 493 (Ala. 1984); McMurphy v. State,455 So.2d 924 (Ala.Cr.App. 1984); Neal v. State, 460 So.2d 257
(Ala.Cr.App. 1984).
When considered in a light most favorable to the State, the evidence establishes the following facts concerning the robbery and murder. The testimony of Reverend Jewel Dutton established that Janice Glasco and "them" had called the victim and told him that they had car trouble up on the mountain. Evidence clearly establishes that they in fact had no car trouble, so it can be inferred that the victim was lured to the scene under false pretenses.
Evidence was also presented which indicated that appellant was in the habit of carrying a large amount of cash around with him. Janice Glasco was very familiar with the victim. Glasco had in fact at one time lived with the victim, and appellant had worked for him. On the day before the murder and on the day of the murder, the victim had been seen carrying a roll of bills which included more than one $100 bill. Appellant also testified that when he went out with the victim, the victim was in the habit of paying for everything. When the victim was found, he had only some change in his front pocket. When apprehended, appellant had a $100 bill, his sister had two $100 dollar bills, and his wife had ten $100 bills. From this, we believe that the jury could reasonably infer that appellant, his wife, and his sister were aware that the victim carried a large sum of money and that they took it from him after appellant killed him.
We further note that evidence of ambush could be inferred in that Randall Curry testified that when he passed the blue Maverick when it was parked, only two women and a child were in the car or around it. He saw no man either time he passed. However, only minutes later, when he passed the blue Maverick on the road, he noticed that it had three adults in it. From this, the jury could infer that the appellant was already waiting in ambush in the woods when the victim arrived. We also note that testimony by the forensic pathologist revealed that the first bullet struck the victim in the right side of his lower jaw and passed through his throat and then exited below the angle of his jaw on the left side. The jury, we believe, could infer that the victim was not facing the appellant at the time he shot him and that he was in fact ambushed, as testified to by Jimmy Dale Owens.
As established by these facts and others set out at trial, we find that the jury could reasonably infer that the victim was lured to the scene and there killed in a robbery.
 V
As his final contention appellant argues that his death sentence was not properly entered. He contends specifically that the trial court did not allow him the opportunity to present arguments as to mitigating circumstances before the court imposed the sentence. An examination of the record reveals that before imposing the sentence the trial court heard mitigating testimony from appellant's mother, Lucille Hamilton; appellant's brother, Jerry Hamilton; appellant's sister-in-law, Faye Hamilton; and a *Page 163 
friend, Alvie Little. The record then reveals that a short recess was called, after which the trial judge returned and made the following statement:
 "THE COURT: All right. If there are no other proceedings to be had or no other offers to be made by the State or the Defendant, let the Defendant and his counsel approach the bench."
The court, thereupon, asked appellant if he had anything to offer, and he did not.
From the above statement it is apparent that the trial court in no way prevented the appellant from arguing the issue of mitigating circumstances. If the appellant had desired to make argument, he could have requested that he be allowed to do so at this point. Section 13A-5-47(c), Code 1975, provides that "Before imposing sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case." If appellant had intended to exercise this right, he could have informed the court of his intention after the trial court made the above statement. We find that no error was committed by the trial court with regard to this issue.
The appellant further contends that the trial court was not fully aware of the facts of the case and that this fact was evidenced by its sentencing order. That sentencing order is set out as an appendix to this opinion. Specifically, he contends that this is shown by conclusions of the trial court that there was a discussion before the crime about robbing the victim, that the appellant hid in the woods, and that he shot the victim immediately upon his arrival at the scene.
The trial court's conclusion that the appellant hid in the woods and shot the victim immediately upon his arrival is clearly supported by the testimony of Jimmie Dale Owens. That there was a discussion about robbing the victim could clearly be inferred from the evidence. In view of the fact that the evidence established that the victim was called to the scene under false pretenses, that he was immediately shot, and that a large amount of money was later found on the accomplices, we conclude that the inference of a prior plan or scheme could easily be drawn, and we find no error in the finding of facts.
 VI
As required by § 13A-5-53(a), Code of Alabama 1975, this court reviews the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
 (1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings?
 (2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
 (3) Was the death penalty the proper sentence in this case?
As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the defendant's rights. As to the second question, we have reviewed the record and are satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence.
To answer the third question, whether the death penalty was properly imposed in this case, we must determine:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Alabama Code 1975, § 13A-5-53(b); see also Beck v. State,396 So.2d 645 (Ala. 1981). *Page 164 
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty was appropriate in this case. We find that there were two statutory aggravating circumstances in this case, as provided by § 13A-5-49(1) and (4), Alabama Code 1975. Those were that appellant committed the offense while he was under a sentence of imprisonment and that the capital offense was committed during the course of a robbery. We further find that there were no statutory mitigating circumstances, as provided by §13A-5-51, Alabama Code 1975. Finding none of the statutory mitigating circumstances under § 13A-5-51 to be applicable and none of the claims of nonstatutory mitigating circumstances raised by appellant to have merit, we determine that the aggravating circumstances clearly outweigh the mitigating circumstances that the death penalty was appropriate in this case.
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not excessive or disproportionate to the penalty imposed in similar cases. See, e.g., Jones v. State, 520 So.2d 543 (Ala.Cr.App. 1984); Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984); Jones v. State, 450 So.2d 165
(Ala.Cr.App. 1983); Singleton v. State, 465 So.2d 432
(Ala.Cr.App. 1983), aff'd, 465 So.2d 443 (Ala. 1985); Bush v.State, 431 So.2d 555 (Ala.Cr.App.), aff'd, 431 So.2d 563 (Ala. 1983); Ritter v. State, 375 So.2d 270 (Ala. 1979); Jacobs v.State, 361 So.2d 640 (Ala. 1978).
We have searched the record, as required by Rule 45A, A.R.A.P., and have found no error which adversely affected the rights of the defendant. The sentence of death was proper in this case. Therefore, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.
 APPENDIX NO. CC-84-131 IN THE CIRCUIT COURT FOR LAWRENCE COUNTY, ALABAMA. SENTENCING ORDER
Tommy Hamilton stands convicted by a jury of his peers of the capital offense of murder of the intentional kind, committed during the commission of robbery in the first degree in violation of Title 13A-5-40(a)(2), Code of Alabama.
In a separate sentencing phase, the same jury returned its advisory verdict that defendant be sentenced to death by electrocution by a vote of ten (10) to two (2).
On September 25, 1985, the Court held the sentencing hearing mandated by Title 13A-5-47. Defendant was allowed to present evidence that he deemed appropriate and argument was presented by the State and defendant.
Prior thereto, a presentence report was ordered and made a part of the record in this case. Counsel for defendant and defendant were given ample opportunity to examine the report for inaccuracies and no part of the presentence investigation and report has been or shall be kept confidential. The presentence investigation ordered herein was deemed to be substantially correct and was accepted as part of the evidence in this case.
The Court has considered the presentence report as to the background of the defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The Court, however, has made its own independent analysis of the existence or non-existence of aggravating and mitigating circumstances. The Court has made its own special application of the facts which the Court has heard and has carefully reviewed the enumerated aggravating circumstances and mitigating circumstances whether enumerated or not.
At the sentence hearing, the State's attorney urged the Court to accept the recommendation *Page 165 
of the jury and fix defendant's punishment at death. Defendant, through counsel, has argued to the Court that the recommendation of the jury as to the advisory verdict should not be the final judgment of the Court and that life without parole would be the proper and just sentence.
 SUMMARY OF THE CRIME AND DEFENDANT'S PARTICIPATION
The evidence in this case shows that on or about the 11th day of July, 1984, Tommy Hamilton, the defendant in this case, and two (2) other co-defendants, namely: Debbie Gatlin Hamilton and Janice Hamilton Glasco, entered into a discussion about how they could raise money quickly.
The evidence further shows that Tommy Hamilton and his two (2) co-defendants had been drinking beer and probably other alcoholic beverages, and during their discussion about how they could raise money quickly, they had a discussion about the possible robbery of Lehman Wood, the victim in this case, and who was also Tommy Hamilton's employer in his capacity of Civil Defense Director, and who was also seeing Janice Giasco socially.
The evidence further shows that Tommy Hamilton, in the company of Debbie Hamilton, Janice Glasco, and the minor son of Janice Glasco who was approximately five (5) or six (6) years old, drove to the Mallard Creek area of Lawrence County, Alabama, and there, surreptitiously entered the home of Lowell Chaffin, took a rifle, which the evidence in this case shows was the weapon used during the robbery and killing of Lehman Wood. Subsequent to leaving the Mallard Creek area with this rifle, defendant Tommy Hamilton and the co-defendants made several telephone calls, one of which was to the victim in this case, Lehman Wood. During the conversation with Lehman Wood, Wood was asked to come to the intersection of Highway 33 and Ridge Road in Lawrence County, Alabama, where supposedly he was to aid Tommy Hamilton and his co-defendants in getting their car started which the evidence in this case shows they told Lehman Wood had broken down.
The evidence further shows that at the time Lehman Wood reached the intersection of Highway 33 and Ridge Road in Lawrence County, Alabama, the defendant, Tommy Hamilton, and his co-defendants had their car parked at the edge of the road with the hood raised.
The evidence further shows that Tommy Hamilton hid in the woods with the rifle as Lehman Wood approached.
The evidence further shows that Lehman Wood, upon arriving at the scene of the crime, stepped out of his vehicle and walked in front of defendant's car, which had the hood raised, and almost immediately Tommy Hamilton, who was hid in the woods, shot him in and about the neck and shoulder, mortally wounding him.
The evidence further shows that at least one or both of the co-defendants drug the victim from the front of the vehicle out of view.
The evidence further shows that cash in excess of one thousand dollars was taken off the body of Lehman Wood.
The evidence further shows that one of the co-defendants questioned as to whether or not Lehman Wood was dead and at that time Tommy Hamilton fired another shot into the body of Lehman Wood, at which time the defendant and the co-defendants left the scene of the crime in their automobile.
The evidence further shows that during their exit from the scene on Highway 33 north, there were two (2) witnesses who observed their leaving the vicinity of the crime, giving a description of their automobile and its occupants some few minutes later. They were arrested in Trinity, Morgan County, Alabama approximately thirty (30) miles from the scene of the crime.
The evidence further shows that from the aid of the minor child who was present in the automobile, the officers assigned to the case located certain evidence near the home of the defendant's Mother, namely: the rifle used in the commission of the crime of first degree robbery and murder. *Page 166 
The evidence further shows that the defendant, Tommy Hamilton, has been in the custody of the authorities since the date of the crime and his arrest.
The evidence further shows that defendant has been mentally evaluated by the staff at Taylor-Hardin Secure Medical Facility and that report has been made a part of the record in this case.
 AGGRAVATING CIRCUMSTANCES Title 13A-5-49, Code Of Alabama
In determining what would be a proper punishment for this defendant, the Court has considered and made the following findings on the enumerated aggravating circumstances specified in the above cited statute.
The Court specifically finds that:
1. The capital offense was committed by the defendant, Tommy Hamilton, while he was under the sentence of imprisonment.
2. The defendant has not been previously convicted of another capital felony involving the use or threat of violence to the person.
3. The defendant did not knowingly create a great risk of death to many persons.
4. The Court specifically finds that the capital offense was committed while the defendant, Tommy Hamilton, was engaged in the commission of robbery in the first degree.
5. The capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
6. The Court specifically finds that the capital offense was not committed for pecuniary gain.
7. The capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of law.
8. The Court specifically finds from the evidence that the capital offense was not especially heinous, atrocious or cruel compared to other capital offenses.
 MITIGATING CIRCUMSTANCES Title 13A-5-51, Code Of Alabama
Mitigating circumstances which the Court has considered during the sentencing hearing are all of those enumerated in Title 13A-5-51, Code of Alabama, as are as follows:
1. The Court finds as a matter of fact and law from the evidence in this cause that the defendant has a significant history of prior criminal activity.
2. The Court specifically finds that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The Court specifically finds that the victim was not a participant in the defendant's conduct, nor consented to it.
4. The Court specifically finds that the defendant was not an accomplice but to the contrary was the main actor in the capital offense committed in this instance and further, that his participation was as a lead person in carrying out the acts made the basis of this offense.
5. The Court specifically finds that the defendant did not act under extreme duress or under the substantial domination of another person.
6. The Court specifically finds that there was no evidence of defendant's failure to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law or that his ability to conform his conduct was substantially impaired.
7. The Court specifically finds that the age of the defendant at the time of the commission of the crime is not a mitigating circumstance.
In addition to the foregoing circumstances enumerated under Title 13A-5-51, the Court, in accordance with the requirements of Title 13A-5-52, has considered all aspects of the defendant's character and record and all aspects of the environment in which he was raised and the evidence offered with reference to the claim by his counsel of his deprived childhood and his *Page 167 
lack of community and family stability in his growing up, and after consideration of all these factors, the Court finds that there are no mitigating circumstances contained as such in any of these offers of proof and the Court declines to declare and find that this is a mitigating circumstance in the defendant's conduct made the basis of this charge and his subsequent conviction.
The Court, after consideration of all the facts, finds specifically that on the offer of the State of Alabama with reference to aggravating circumstances, numbers one (1) and four (4) were proven beyond a reasonable doubt. The Court further notes, based on this finding, in order for the Court to sentence the defendant to life without parole the Court must find that there were mitigating circumstances which were proven in the sentencing phase of this trial and further that those mitigating circumstances proven out weigh the aggravating circumstances which the Court has referred to above.
The Court finds with regard to mitigating circumstances, there were none shown, nor proven.
 CONCLUSION
The death penalty act requires this Court to make an independent analysis of the facts and apply the law to those facts in reaching its conclusion with regard to sentence.
The Court, in conducting the required independent analysis and evaluation of the facts and the aggravating circumstances and the mitigating circumstances, has given the advisory verdict solemn deliberation in determining the weight to be attached.
Under the facts and law of this case and after due consideration and analysis of all the circumstances and consideration of the aggravating circumstances and mitigating circumstances and in weighing them, and in weighing them against each other, the Court concludes and is of the opinion that the aggravating circumstances outweigh the mitigating circumstances.
Based on the finding of fact and the conclusion of law, it is THEREFORE ORDERED AND ADJUDGED that the just and appropriate penalty for the crime for which Tommy Hamilton stands convicted is death by electrocution.
DONE AND ORDERED this 25 day of September, 1985.
 /s/ Billy C. Burney BILLY C. BURNEY, Circuit Judge