[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 924 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 925 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 926 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 927 
The appellant, Brian Andre Smith, was convicted of capital murder, see § 13A-5-40(a)(18), Ala. Code 1975, and of attempted murder. He was sentenced to life in prison without parole. This opinion consolidates the issues raised by the appellant on direct appeal and on appeal from the trial court's denial of his Rule 32 petition for postconviction relief.
A review of the record reveals the following facts. On October 14, 1994, Quincy Smith and Jesse Binon were shot with a .25 caliber pistol while standing on a street corner in Clanton. Smith was pronounced dead at the scene; Binon suffered severe abdominal injuries, but survived. From the record, it appears that Chilton County High School hosted a football game against Jemison High School on the night of the shooting. At the game, several boys from Jemison began fighting with several boys from Clanton. Involved in the altercation were the appellant, Anthony Ford, and Charles Melton (all from Jemison), and Sadaka Davis, Anthony Looney, Bernard Jemison, and Quincy Smith (all from Clanton). The Jemison boys fled after the fight in a white Geo Prism automobile, owned and driven by the appellant's sister. As they were leaving, the appellant stated, "We'll be back." (R. 581.)
Later that night, six boys from Clanton were on a street corner in Clanton's West End; these boys included Davis, Looney, Jemison, Charles Cottrell, and the two victims — Quincy Smith and Jesse Binon. As the six boys were standing on the corner talking, the Prism drove up, followed by two other cars. Davis, Looney, Jemison, and Binon testified that the appellant was leaning out of the passenger-side window of the Prism, pointing a small caliber handgun at the crowd. Davis and Jemison testified that the gun was a .25 caliber pistol; Binon and Looney were unsure of the caliber. When gunfire erupted, five of the six boys began to run. Binon testified that he looked directly at the appellant in the car and said, "Hold up," in the hope that the appellant would not shoot. (R. 788.) Binon stated that he then saw flashes coming from the appellant's hand, but he could not positively state that the bullet that hit him came from the appellant's gun.
In addition to Binon, Jemison, Looney, and Davis, the state called two other eyewitnesses to the shooting: Charles Melton, who was a passenger in the third car behind the Prism at the time of the shooting, and Kevin Nunn, who was driving the car immediately behind the Prism. Melton testified that he heard four or five gunshots, but that he did not see who did the shooting; he saw only the boys on the corner running away. Nunn testified that he saw someone hanging out of the *Page 928 
passenger-side window of the Prism, but he could not identify who it was. He also testified that he never saw a gun, but that he did hear several gunshots. Five of the six eyewitnesses testified that the only gunshots they heard were from a small handgun, while Jemison testified that he heard not only pistol shots, but also shotgun shots. Melton, Nunn, Binon, Jemison, Looney, and Davis all testified that the only gunfire came from inside the Prism and that the boys standing on the corner were not shooting back.
It was undisputed that the appellant, the appellant's sister, and Terrance Lee were in the Prism on the night of the shooting. However, the testimony was conflicting as to the identity of the fourth passenger. Nunn testified that the fourth passenger in the Prism was Darian Ellis. Melton, on the other hand, testified that Robert Davis was the other passenger. The evidence was equally unclear as to who was sitting in what position in the Prism at the time of the shooting. According to Melton, the appellant was in the backseat with Terrance Lee, while Robert Davis was in the front passenger seat. Jemison also testified that the appellant was in the backseat. However, according to Sadaka Davis, Binon, and Looney, the appellant was in the front passenger seat.
As part of its case-in-chief, the state introduced several pieces of evidence, including a .25 caliber Lorcin pistol, a Winchester shotgun, two spent shotgun shells found five blocks from the shooting, and three spent pistol cartridges found at the scene. All of these items were introduced over defense objections. The state called several witnesses to verify the chain of custody of the items, including Ray Mann, an officer with the Clanton Police Department, who was in charge of the investigation. In addition, the state called Joseph Saloom, a firearms expert with the Alabama Department of Forensic Sciences. Saloom testified that the .25 caliber pistol introduced by the state was the murder weapon. He stated that the bullet taken from the body of Quincy Smith and the bullet removed from Jesse Binon had both been fired from the pistol. However, he could not verify that the spent cartridges found at the scene had been fired from the pistol. No fingerprints were found on the pistol.
 I. Issues on Direct Appeal A.
The appellant contends that the trial court violated his constitutional rights when it refused to allow him to call witnesses on his behalf at the preliminary hearing.
Although it is clear from the record that a preliminary hearing was held, the record contains no transcript of that hearing. "An appellate court is `bound by what appears in the record before [it]. The appellant "`bears the burden of bringing the record before an appellate court. He and his counsel have the duty of checking the record before submitting the appeal. It is their duty to file a corrected record.'"'" Ingram v. State,629 So.2d 800, 804 (Ala.Cr.App. 1993), quoting Jordan v. State,607 So.2d 333, 335 (Ala.Cr.App. 1992) (citations omitted). We will not predicate error on a silent record.
However, even if the record were complete and we could properly review this issue, we would decide it adversely to the appellant. "`Constitutionally, a preliminary hearing is not necessary to satisfy the requisites of due process.'" Herriman v.State, 504 So.2d 353, 357 (Ala.Cr.App. 1987), quoting Duncan v.State, 369 So.2d 885, 887 (Ala.Cr.App. 1979). Furthermore, after indictment, "no reversible error . . . can be predicated on the denial of a preliminary hearing." Goodwin v. State, 495 So.2d 731,732 (Ala.Cr.App. 1986). Therefore, the trial court's refusal, if any, to allow the appellant to call witnesses at the preliminary hearing was not reversible error. *Page 929 
 B.
The appellant contends (issues two and three in his brief) that the trial court erred to reversal in admitting into evidence the .25 caliber Lorcin pistol identified as the murder weapon and the Winchester shotgun found pursuant to a search warrant executed at the home of Robert Davis, the alleged fourth passenger in the Prism on the night of the shooting. He advances substantially the same arguments as to the admission of both guns.
First, the appellant argues that the state failed to connect him to either the pistol or the shotgun. Specifically, he claims that without such a connection, there was no evidentiary foundation for admission of the guns at trial. We disagree.
 "`Before the admission of demonstrative evidence at a trial, such evidence must be identified. The testimony can be visual, that is, by testimony at the trial that the object displayed is the one related to the case. For admission, it suffices if the evidence establishes that it is more probable than not that the object is connected with the case. A preponderance of the evidence is sufficient.'"
Mims v. State, 591 So.2d 120, 124 (Ala.Cr.App. 1991), quotingState v. Nelson, 261 La. 153, 164-68, 259 So.2d 46, 51-52 (1972). The pistol and the shotgun were both identified by Joseph Saloom, the state's firearm expert. Saloom testified that the bullet removed from Quincy Smith's body and the bullet removed from Jesse Binon were both fired from the .25 caliber Lorcin pistol, thus identifying the pistol as the weapon used in the crime. In addition, Saloom testified that the two shotgun shells found five blocks from the scene of the crime had been fired from the Winchester shotgun admitted into evidence. This, combined with the testimony that a shotgun was fired during the drive-by shooting the appellant was involved in, made it more probable than not that the shotgun was also connected to the incident. Thus, a proper foundation was laid for the admission into evidence of both guns. Whether those guns were connected to the appellant was a question of the weight and credibility of the evidence, not its admissibility.
The appellant contends that, even if a proper foundation was laid, the guns were irrelevant and had no probative value because they had no connection to him. "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala.R.Evid. "In order to be admissible under Alabama law, evidence must merely have `any probative value, however slight, upon a matter in the case.'" Tankersley v. State,724 So.2d 557, 562 (Ala.Cr.App. 1998), quoting C. Gamble, McElroy'sAlabama Evidence, § 21.01(1) (5th ed. 1996). There was evidence elicited at trial that the appellant aimed a .25 caliber pistol at the boys on the corner just seconds before the shooting. In addition, Saloom's testimony that the .25 caliber Lorcin pistol was the murder weapon was undisputed. This evidence was probative as to the question of the appellant's guilt. The pistol was therefore "of consequence" to a material fact in the case and was properly admitted into evidence.
The appellant also contends that the shotgun specifically was inadmissible because, he says, it was not only not connected to him, but also not connected to the crime charged, because the victims were shot with a pistol, not a shotgun. As stated above, the shotgun was linked to the shooting incident through testimony that a shotgun was fired during the shooting and through the evidence of the spent shells discovered five blocks from the shooting scene. Even assuming, for the sake of argument, that the admission of the shotgun into evidence was error, it was harmless error. This weapon "was not used in any manner to identify or *Page 930 
incriminate the appellant or to connect [him] with the crime charged." Carroll v. State, 370 So.2d 749, 759 (Ala.Cr.App. 1979).
Second, the appellant contends that "the existence of the [guns was] discovered through inadmissible hearsay evidence," and therefore, he says, the guns were inadmissible at trial. (Appellant's brief at p. 12.) In support of this argument, the appellant attaches to his brief a transcript of a tape-recorded conversation between Ray Mann, the officer in charge of the crime investigation, and Quinton Smith, an informant who told Mann where he could find the .25 caliber Lorcin pistol and the Winchester shotgun. In this conversation, Smith told Mann that he received the Lorcin pistol from Robert Davis, a passenger in the Prism on the night of the shooting. Apparently, Davis told Smith that the pistol was the weapon used in the shooting. Smith also told Officer Mann that the Winchester shotgun was owned by Davis's father. The appellant appears to argue that because the conversation leading to the discovery of the guns was "hearsay," the guns themselves were inadmissible at trial.
At the outset, we note that the tape-recorded conversation between Officer Mann and Quinton Smith was not part of the record; a transcript of that conversation was attached to the appellant's brief to this court.
 "`[E]xhibits attached to a brief are not evidence and cannot be considered by this Court on appeal. "`This Court is bound by the record [on appeal] and may not consider asserted facts which cannot be ascertained [from] that record.'"'"
Lucas v. State, 722 So.2d 822, 823 (Ala.Cr.App. 1998), quotingRiddle v. State, 669 So.2d 1014, 1016-17 (Ala.Cr.App. 1994) (citations omitted). Therefore, the tape-recorded conversation cannot be considered by this court.
Moreover, even if we could properly consider the tape-recorded conversation in reaching a determination on this issue, we would still decide the issue adversely to the appellant. The appellant argues that "[t]he testimony of Smith to Mann was hearsay, the testimony from Davis to Smith was hearsay, and thus the admission of the pistol was based on inadmissible hearsay." (Appellant's brief at pp. 13-14.) This argument is baffling. Neither Davis nor Smith testified at the appellant's trial; therefore, their statements were not testimony. Furthermore, their statements were not hearsay. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala.R.Evid. (emphasis added). If the statement is not offered into evidence, it is by definition not hearsay. Contrary to the appellant's assertion, the tape-recorded conversation was never offered or introduced into evidence at the appellant's trial and was never heard by the jury; therefore, it could not be hearsay. In addition, the guns were not introduced into evidence during the testimony of Officer Mann, a participant in the taped conversation; rather, Joseph Saloom, the state's firearm expert, identified both weapons, linked them to the crimes charged (see discussion above), and thereby laid the foundation for their admission. There was no hearsay in relation to either of the guns.
Furthermore, the appellant, before Officer Mann's testimony, made a motion in limine to prevent the state from presenting "any hearsay that comes from Robert Davis or Quinton Smith." (R. 935.) Obviously, the appellant was preparing for the taped conversation to be offered for admission into evidence. However, that never happened; the trial court granted the appellant's motion, and Officer Mann never testified as to how he discovered the gun or as to his conversation with Quinton Smith. Therefore, the appellant's argument that the guns were inadmissible because they were discovered through hearsay is without merit. *Page 931 
The appellant also argues that the shotgun should have been suppressed because, he says, the search warrant used to obtain it was defective.[1] The shotgun was discovered during a search of Robert Davis's home, based on information that the police received from Quinton Smith. (See discussion above.) The appellant argues that the warrant was invalid because, he says, the affidavit of Officer Mann used to obtain the warrant contained "untrue statement[s]." (Appellant's brief at p. 16.) The appellant does not have standing to challenge the search of Davis's home. "In order to raise a Fourth Amendment claim, a defendant must assert a property or possessory interest in the property searched or seized or must show such an interest as to give him a legitimate expectation of privacy in the area searched." Rivers v. State, 666 So.2d 34, 35 (Ala.Cr.App. 1994). The appellant has failed to show any such interest in Davis's home or in the shotgun itself. Contrary to the appellant's assertion that "if the [shotgun] can be introduced, then it can be attacked" (appellant's brief at p. 16), the United States Supreme Court has stated that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas v. Illinois,439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Therefore, the appellant does not have standing to challenge the search.
 C.
Next, the appellant argues that the trial court committed reversible error in refusing to allow defense counsel to cross-examine two state witnesses concerning their pending criminal charges (issues four and five in appellant's brief). In addition, he argues that the state failed to timely disclose the pending charges. Both of these arguments are without merit.
On the first day of trial, defense counsel attempted to cross-examine Rod Ellis McMillian concerning a pending charge against him in Chilton County for armed robbery. The state objected to the question, and the trial court sustained the objection. On the second day of trial, defense counsel attempted to cross-examine Anthony Looney regarding pending juvenile charges against him. The state again objected; however, during arguments on the objection, the state changed its position and withdrew its objections with respect to both McMillian and Looney. In addition, the state offered to recall both witnesses to permit further cross-examination. The defense, however, objected to recalling either witness, and, after the trial court permitted both witnesses to be recalled, the defense refused to cross-examine them.
The appellant now wishes to predicate error on his own objection and refusal to cross-examine. This is akin to invited error. "`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'" Perkins v. State, 580 So.2d 4, 10 (Ala.Cr.App. 1990). The appellant argued at trial that he should be permitted to cross-examine both witnesses on their pending criminal charges. After much debate, he was permitted to do so. The fact that he then refused to do so does not constitute reversible error on the part of the trial court.
Furthermore, any error on the part of the trial court in initially refusing to allow the defense's line of questioning was rendered harmless when the witnesses *Page 932 
were recalled. Any potential bias of the witnesses caused by their pending charges was put before the jury; the state, upon recall of the witnesses, questioned both witnesses about the pending charges, and both witnesses testified that they had made no deals with the state for their testimony. "`[W]here objection is sustained, but the party, nevertheless, proceeds to get in the evidence sought, in substance and effect, which is not excluded and remains for the jury's consideration, the initial ruling, if erroneous, is harmless.'"Houston v. State, 565 So.2d 277, 281 (Ala.Cr.App. 1990), quotingRoberson v. State, 233 Ala. 442, 444, 172 So. 250, 251 (1937).
The appellant also contends that the state failed to timely disclose the existence of the pending charges against McMillian and Looney, and that its failure to do so violated a discovery motion that granted the defense discovery of all pending criminal charges of any of the state's witnesses. He claims that he was not informed of any pending charges until after he attempted to cross-examine McMillian and Looney and that, therefore, he is entitled to a new trial. We disagree.
First, we note that the appellant's discovery motion was granted only in part. The trial court granted the motion as to any pending adult criminal charges in Chilton County, but denied the motion as to any pending juvenile criminal charges.[2]
Because the charges pending against Looney were juvenile charges, the state did not violate the motion by late disclosure of the juvenile charges. Second, it is clear from the record, and from the appellant's arguments on appeal, that even if the appellant was not specifically informed of the charges until after the trial commenced, he was well aware of them, and was given the opportunity to cross-examine both McMillian and Looney on any possible bias they might have had. (See discussion above.) Furthermore, the prosecutor brought out the pending charges, including the juvenile charges, on direct examination when the witnesses were recalled. See Davidson v. State, 491 So.2d 1040
(Ala.Cr.App. 1986) (no prejudice to defendant when State brought out pending charges against witness during direct examination and defendant had an opportunity to impeach the witness with this information on cross-examination). The appellant has, therefore, failed to show how he was harmed by the late disclosure. SeeShearer v. State, 579 So.2d 692 (Ala.Cr.App. 1991) (the jury was fully apprised of the agreement between the state and the state's witness, so late disclosure was harmless). Thus, the late disclosure on the part of the state was harmless.
 D.
The appellant also contends that the state failed to present sufficient evidence of the specific intent to kill to sustain the verdict of capital murder (issue six in appellant's brief). Specifically, he argues that because, he says, he did not have a specific, or particularized, intent to kill and because "there is doubt as to who actually harmed the victim," he could not be convicted of capital murder either as a principal or as an accomplice. (Appellant's brief at p. 24.)
"`[N]o defendant is guilty of a capital offense unless he had an intent to kill." Lewis v. State, 456 So.2d 413, 416
(Ala.Cr.App. 1984). "However, a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself." Id. at 417. "`[A] defendant who does not personally commit the intentional killing which is part of the capital offense is nonetheless guilty of it and can be convicted of the capital offense, if that defendant intentionally promotes or assists in the commission of the intentional killing which is actually done by another.'" Id. (citation omitted). *Page 933 
"Pulling the trigger is only one factor in determining the intent to kill." Ex parte Raines, 429 So.2d 1111, 1113 (Ala. 1982). Therefore, even if there was doubt as to who actually shot the victim, the appellant could still be convicted for capital murder under an accomplice theory.
Under either theory, however, the appellant could be convicted only if he had a specific, or particularized, intent to kill. "To affirm a finding of a `particularized intent to kill,' the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill." Exparte Raines, 429 So.2d at 1113. After carefully reviewing the trial court's entire oral charge, we find that the jury was properly instructed on the intent issue. The trial court explained that to convict the appellant of capital murder, the state had to prove beyond a reasonable doubt that the murder was the "intentional type" and that the victim was killed while outside a motor vehicle by a deadly weapon fired from inside a motor vehicle. See § 13A-5-40(a)(18), Ala. Code 1975. The court then went on to define intentional murder, including the requirement that the intent to kill be "real and specific." (R. 1189.) The court also properly instructed the jury on complicity. (See our discussion in Part I.F. of this opinion.) Therefore, we find that the jury was properly charged on the intent-to-kill issue.
We also find that there was sufficient evidence from which a jury could reasonably conclude that the appellant possessed a specific intent to kill.
 "In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust."
Powe v. State, 597 So.2d 721, 724 (Ala. 1991) (citations omitted). Contrary to the appellant's claim, the lack of testimony as to the appellant's intent does not negate the existence of such intent. "[C]ircumstantial evidence alone may be sufficient in conjunction with other facts and circumstances which tend to connect the accused with the commission of the crime to sustain a conviction."Scanland v. State, 473 So.2d 1182, 1185 (Ala.Cr.App. 1985). Furthermore, "[i]ntent may be inferred from the use of a deadly weapon." Id. The state presented evidence that the appellant fired a .25 caliber pistol at six boys standing on a street corner in Clanton, Alabama. One of those boys died, while another was severely injured. After the shootings, a .25 caliber Lorcin pistol was found in a pond and was positively identified as the murder weapon. All the gunfire on the night of the shooting came from the car in which the appellant was riding. Earlier in the evening, the appellant had gotten into an altercation with the murder victim, and, as he was leaving, the appellant stated, "We'll be back." See Dubose v. State, 563 So.2d 18 (Ala.Cr.App. 1990) (a prior altercation between the defendant and the victim was evidence of specific intent to kill). This evidence was sufficient to sustain the appellant's conviction for capital murder, either as a principal or as an accomplice.
The appellant also contends that the jury's guilty verdict was against the great weight of the evidence. Specifically, he argues that it was impossible for the state to overcome the burden of reasonable doubt because the state's own expert, Dr. James Lauridson, testified that the presence of the bullet wound in the deceased victim was as consistent with the defense's theory of the events as it was with the state's theory. The defense theory, *Page 934 
throughout the trial, was that someone else, namely Charles Cottrell, shot the victim. In essence, the defense contended that as Cottrell was running from the Prism, he turned around and fired back at the Prism, accidentally shooting the victim as the victim was also running from the Prism. Dr. Lauridson testified that such a hypothetical scenario was consistent with the bullet wound found in the victim's chest. The appellant contends that this testimony created reasonable doubt as to his guilt and therefore that the verdict was against the great weight of the evidence. We disagree.
At the outset, we note:
 "`The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency
of the evidence concerns the question of whether, "viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt."
 "`In contrast, "the `weight of the evidence' refers to a `determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.'" We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. "`The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.'"'"
Seaton v. State, 645 So.2d 341, 342-43 (Ala.Cr.App. 1994), quotingJohnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App. 1989) (emphasis in Johnson; citations omitted). In this case, Dr. Lauridson's testimony presented nothing more than a jury question. Merely because Dr. Lauridson testified that there was more than one theory of events consistent with the bullet wound did not create reasonable doubt; rather, it created a question of fact to be resolved by the jury. "Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case." Ingram v. State, [Ms. CR-94-1032, February 8, 1998] 729 So.2d 883, 895 (Ala.Cr.App. 1998).
 E.
Next, the appellant claims that the trial court committed reversible error in refusing to allow defense witness Hosea Atchison, Jr., to testify.
At trial, the appellant called Charles Cottrell to testify for the defense. After asking Cottrell the standard questions — e.g., his name and address — defense counsel immediately began questioning Cottrell in line with the defense's theory that Cottrell had a weapon on the night of the shooting and that he was firing it at the Prism. Cottrell denied having a weapon on the night of the shooting. Defense counsel then questioned him about an alleged conversation he had had with Atchison, in which he allegedly told Atchison that he did have a gun on the night of the shooting. Cottrell denied having had any such conversation with Atchison. The defense then attempted to call Atchison to testify as to the alleged conversation with Cottrell. The state objected, and the trial court sustained the objection.
On appeal, the appellant cites Rules 616 and 613, Ala.R.Evid., to support his argument that Atchison should have been allowed to testify as to the alleged conversation with Cottrell. First, we note that Rule 616, Ala.R.Evid., is inapplicable here. Rule 616 states that evidence of bias, prejudice, or interest on the part of a witness is admissible to attack the witness's credibility. However, this is not a case in which the defense was seeking to show bias. It is clear from defense counsel's offer of proof as to Atchison's proposed testimony that the purpose of the testimony was to prove, through extrinsic evidence, a prior inconsistent statement made by Cottrell, not to prove bias. Thus, Rule 616 is inapplicable. *Page 935 
The appellant also cites Rule 613, Ala.R.Evid., which states, in pertinent part:
 "(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or to deny having made it."
Looking at this rule, standing alone, one might conclude that Atchison's testimony might be admissible to impeach Cottrell's testimony. However, as the state contends, the rules of evidence do not operate in a vacuum. Although Rule 607, Ala.R.Evid., permits a party to impeach his own witness, "`the right to impeach one's own witness is not absolute and may be held inapplicable due to abuse.'" Burgin v. State, [Ms. CR-98-0111, March 26, 1999] 747, So.2d 916, 918 (Ala.Cr.App. 1999), quoting C. Gamble, McElroy'sAlabama Evidence, § 165.01(6)(b) (5th ed. 1996).
In Burgin, this court was persuaded by the federal courts' interpretation of Rule 607 of the Federal Rules of Evidence, which is identical to the Alabama Rule:
 "`[Rule] 607 allows the government to impeach its own witness. See Fed.R.Evid. 607. However, "`the government must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony.'" United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir. 1990) (quoting United States v. Whitson, 587 F.2d 948, 952-53 (9th Cir. 1978)). Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible. Id. A determination must be made as to whether the government examined the witness for the primary purpose of placing before the jury substantive evidence which is otherwise inadmissible. Id.'"
Burgin, 747 So.2d at 918, quoting United States v. Gilbert,57 F.3d 709, 711 (9th Cir.), cert. denied, 515 U.S. 1110,115 S.Ct. 2264, 132 L.Ed.2d 269 (1995). As this court stated in Burgin, "'[i]t would be an abuse of the rule . . . for the prosecution to call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence.'" Id.
The rules limiting the prosecution's ability to impeach prosecution witnesses are equally applicable to the defense. Thus, although the defense may impeach its own witness, it may not do so solely for the purpose of introducing otherwise inadmissible evidence. We believe that was the case here. When defense counsel called Charles Cottrell to testify, the only substantive questions asked related to Cottrell's alleged possession of a gun on the night of the shooting and his alleged statement to Atchison. Furthermore, it is clear from the record that the defense knew that Cottrell would deny possessing a gun on the night in question and would deny that he participated in a conversation with Atchison; the prosecutor in this case maintained an open-file policy, and Cottrell's statement to the police, in which no mention of having a gun was made, was given to the defense. In addition, of over 25 witness statements taken and subsequently given to the defense, none indicated that Cottrell had a gun on the night of the shooting. The only support for the defense theory was the testimony of one defense witness. Thus, it is obvious that the defense's sole purpose for calling Cottrell to testify was to have him deny making the statement so that the defense could then seek to introduce the statement into evidence under the guise of impeachment. The appellant even conceded that the sole purpose of having Atchison testify was to introduce the alleged *Page 936 
statement made by Cottrell that he had had a gun on the night of the shooting, which would bolster the defense's theory that someone other than the appellant had fired the fatal shot that killed Quincy Smith. Such a statement would be blatant hearsay that otherwise would have been inadmissible. Therefore, we find that the trial court did not err in refusing to permit the testimony of Atchison.
Even assuming, for the sake of argument, that the trial court did err in not allowing the defense to call Atchison to testify, we believe that such error was harmless. From the defense's offer of proof, it is clear that Atchison was planning to testify only to Cottrell's alleged statement that he was carrying a gun on the night of the shooting. Such a statement would have bolstered the defense's theory that someone else shot the victims. However, the statement also would have been cumulative of other evidence already admitted by the defense. Before calling Atchison, the defense called Arlesicia Smith to testify. Smith testified that she was an eyewitness to the shooting and that she saw Cottrell and several others shooting back at the Prism; however, she could not identify anyone other than Cottrell as possessing a weapon. Thus, evidence of Cottrell's possession of a weapon was already before the jury. "The exclusion of admissible evidence does not constitute reversible error where the evidence `would have been merely cumulative of other evidence of the same nature, which was admitted.'" Houston v. State, 565 So.2d 277, 281 (Ala.Cr.App. 1990).
 F.
Finally, the appellant argues that the trial court's jury charge on complicity "had no place in the charges in this case" because, he says, the state did not argue complicity. (Appellant's brief at p. 29.) In addition, he argues that even if the complicity charge was applicable, it was improper. Neither argument has any merit.
First, it is quite clear from the record that the state had two alternative theories of the case against the appellant. The state argued that the appellant was the principal, i.e., that he fired the shots that killed one victim and wounded another, and, in the alternative, the state argued that even if the appellant did not fire the shots that actually hit the victims, he was firing shots from the car, thereby evidencing his intent to assist in the intentional murder. The state presented sufficient evidence to support a guilty verdict based on either theory. (See our discussion in Part I.D. of this opinion.) Therefore, the trial court correctly charged the jury on the theory of complicity.
The appellant also contends that the charge on complicity was improper because, he says, the trial court "failed to instruct the jury to find that the appellant had a `particularized intent to kill,'" and because the instruction "was confusing and could lead the jury to believe that it could convict the defendant of capital murder if the murder was of the reckless type and he was in the vehicle." (Appellant's brief at p. 29.) We disagree.
The court instructed the jury, in pertinent part, as follows:
 "There are two components of a capital case. One, a person committed the crime of murder of the intentional type. Two, that the victim was killed while outside a motor vehicle by a deadly weapon fired from inside the motor vehicle.
 "A person commits the crime of murder of the intentional killing type if with the intent to cause the death of another person he causes the death of that person or another. A person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct. Intent, being a state of mind, is rarely susceptible to direct proof but ordinarily can be inferred from the surrounding facts and circumstances as you find *Page 937 
those circumstances to be. The defendant must intentionally, as opposed to recklessly, negligently, or accidentally, cause the death of the deceased in order to invoke this capital murder statute. The intent must be real and specific.
". . . .
 "Now, you've heard the term `complicity.' A person is legally accountable for the behavior of another person constituting a crime if with intent to promote or assist in the commission of a crime they either procure, induce, or cause such other person to commit the crime or aids or abets such other person in committing the crime. If you find that a murder of the intentional killing type of Quincy Smith was committed by some person other than the defendant, the defendant is guilty of the intentional killing type of murder if, but only if, you find beyond a reasonable doubt either that Brian Andre Smith intentionally procured, induced, or caused the other person to commit the murder or that Brian Andre Smith intentionally aided or abetted in the other person's commission of the murder. Only if you are convinced beyond a reasonable doubt that either or both of those situations exist as a fact can you find the defendant guilty of an intentional killing murder which he did not personally commit."
(R. 1188-92.)
These instructions were clearly proper. In holding identical instructions valid in Sockwell v. State, 675 So.2d 4, 24
(Ala.Cr.App. 1993), this court stated:
 "The trial court clearly instructed the jury that the appellant had to possess a particularized intent to kill and it defined an intentional killing. Further, the trial court properly instructed the jury with regard to accomplice liability and aiding and abetting if the jury determined that the appellant did not shoot the victim himself.
 "The instructions in this case do not contain the same flaw as the instructions in Russaw v. State, 572 So.2d 1288
(Ala.Crim.App. 1990), as the appellant argues. In Russaw, the trial court failed to instruct the jury that in the capital offense for robbery-murder, it had to find that the defendant had a particularized intent to kill. Id. at 1289. The trial court in this case plainly charged the jury that it had to find a `real and specific' intent on the part of the appellant in order to invoke the capital statute.
 "Additionally, we do not find the instructions of the trial court confusing in regard to the doctrine of accomplice liability as we did in Russaw. The trial court properly charged the jury on what it would have to find as to the appellant's intent if it determined that he did not actually shoot the victim."
675 So.2d at 24. Therefore, we find that the trial court's charge on complicity was proper.
 II. Rule 32 Issues
The appellant contends that the trial court erred in denying his petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P., in which he alleged four instances of ineffective assistance of trial counsel. The trial court held an evidentiary hearing on the petition, after which it denied three of the appellant's claims. The appellant's fourth claim, under Rule 32.1(f), Ala.R.Crim.P., that his trial counsel, David Nichols, failed to timely file an appeal, was granted, and an out-of-time appeal was permitted. The appellant appeals the trial court's denial of his other three claims of ineffective assistance of counsel.
The following facts are relevant to this court's resolution of these ineffective-assistance issues. At the preliminary hearing and the youthful offender hearing, the appellant was represented by attorney John Medaris. Immediately after the youthful offender hearing, Medaris withdrew and David Nichols was appointed to represent *Page 938 
the appellant for trial. William Hill was cocounsel at trial. Immediately after trial, Hill withdrew as counsel, while Nichols remained as counsel for the appellant's direct appeal. Medaris was retained for the filing of the appellant's Rule 32 petition and this subsequent appeal.
The appellant alleges three instances of ineffective assistance of counsel. First, the appellant contends that he was denied effective assistance of counsel because, he says, attorney William Hill was laboring under an actual conflict of interest while he was representing the appellant. Second, the appellant contends that he was denied effective assistance of counsel because, he says, both Hill and David Nichols failed to inform him of his right to testify. Third, the appellant contends that both Hill and Nichols were ineffective because, he says, they failed to inform him of an offer made by the state before trial in which the state would agree to a sentence of life with the possibility of parole. None of these claims has merit.
The United States Supreme Court, in Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), articulated two criteria that must be satisfied to establish ineffective assistance of counsel. A defendant has the burden of showing (1) his counsel's performance was deficient, and (2) that the deficient performance actually prejudiced the defense. Furthermore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id., 466 U.S. at 690,104 S.Ct. at 2065.
The appellant claims that Hill's representation of the appellant's sister, who was alleged to be the driver of the Prism on the night of the shooting and who faced charges arising out of her own alleged participation in the shooting, created an actual conflict of interest that was never waived and that prejudiced his defense. To prevail on a conflict-of-interest claim, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348,100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). If a defendant shows both that an actual conflict existed, and that the conflict adversely affected his lawyer's performance, prejudice may be presumed. In the absence of proof of these two factors, however, the defendant must affirmatively prove prejudice. The appellant claims that the fact that Hill represented two codefendants in cases arising out of the same crime is proof of an actual conflict that adversely affected Hill's performance in the appellant's case. We disagree. "Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel." Holloway v. Arkansas, 435 U.S. 475, 482,98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978).
The appellant also claims that, on two occasions, Hill made strategic decisions about the appellant's trial in an effort to protect the appellant's sister rather than the appellant. First, the appellant claims that Hill knew of an offer by the state to take a plea with respect to the appellant and purposefully did not inform the appellant because, the appellant says, if he accepted the offer, the appellant may have had to agree to testify against his sister. The record from the Rule 32 hearing contradicts this assertion. Hill testified that he did not know of any offer by the state to take a plea from the appellant, and there is nothing in the record to indicate otherwise. The appellant's own self-serving accusation that Hill knew of the offer and that he purposefully failed to inform him is simply not sufficient to prove that Hill's performance was deficient. Second, the appellant claims that Hill refused to allow him to testify at his trial because, he says, his testimony would be damaging to his sister's case. There is no evidence in the record to support this contention. When the prosecutor, at the Rule *Page 939 
32 hearing, attempted to elicit from the appellant exactly what he would have testified to had he testified, defense counsel objected and the trial court sustained the objection. Therefore, there is nothing in the record indicating that the appellant's testimony would have been harmful to his sister.
Furthermore, Hill himself testified that his defense theory was the same for both the appellant and the appellant's sister, and thus, he believed that there was no actual conflict. "An `attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" Holloway, 435 U.S. at 485, 98 S.Ct. at 1179. Although there is always a potential for conflict when one attorney represents two codefendants, "`[a] possible, speculative or merely hypothetical conflict does not suffice.'" Browning v.State, 607 So.2d 339, 342 (Ala.Cr.App. 1992). Rather, to violate the right to effective assistance of counsel, an attorney must "actively represent conflicting interests." Cuyler,446 U.S. at 350, 100 S.Ct. at 1719. An actual conflict is a real conflict, evidenced by inconsistent interests, and "inherently conducive to divided loyalties." Browning, 607 So.2d at 342, quoting Zuck v.Alabama, 588 F.2d 436, 439 (5th Cir.), cert. denied,444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). We find no evidence that Hill's loyalties were divided; rather, it is clear from the record of the trial that Hill vigorously advocated the appellant's position at all times. Therefore, the appellant's claim that he was denied the effective assistance of counsel because Hill had an actual conflict of interest must fail.
Second, the appellant contends that he was denied effective assistance of counsel because, he says, neither Hill nor David Nichols informed him of his right to testify. At the Rule 32 hearing, the appellant testified that he never had a conversation with either of his attorneys informing him that he had a right to testify on his own behalf. He contended that Nichols merely told him that he would not be testifying because "the DA would chew [him] up." (R. 1359.) Nichols, however, testified that he had two conversations with the appellant about testifying, at least one of which, he said, was lengthy and extensive. In these conversations, said Nichols, he informed the appellant of his right to testify, but he strongly advised against it, believing that facts detrimental to the appellant's case would come out on cross-examination. Nichols testified that the decision not to testify was made with the appellant's input. Hill testified that he remembered being present at the meeting in which Nichols and the appellant discussed the appellant's right to testify, but he stated that he did not participate in the discussion. He also corroborated Nichols's testimony that the appellant was involved in making the decision not to testify.
It is clear that in denying the appellant's Rule 32 petition, the trial court resolved the conflicts in testimony adversely to the appellant. We find no reason to disturb the trial court's ruling. The appellant has not proven by a preponderance of the evidence that his counsel's performance was deficient.
Third, the appellant contends that he was denied effective assistance of counsel because, he says, neither Hill nor Nichols informed him, or his mother, of the state's offer of a plea in which the appellant would be sentenced to life imprisonment with the possibility of parole. The appellant testified at the Rule 32 hearing that he was never informed of the offer. The appellant's mother, Dazella Peoples, also testified that she was never informed of the offer. Both stated that had they known of the offer, they would have accepted. Nichols, on the other hand, testified that on the day he received the offer, he sent a letter to Peoples informing her of the offer. A copy of that letter is included in the record. In addition, Nichols testified that he spoke with Peoples on the *Page 940 
telephone and urged her to accept the state's offer, but she refused, without discussion. Nichols also stated that he spoke with the appellant in person about the offer and that the appellant also immediately refused the offer. In addition, as stated above, contrary to the appellant's assertion, the record indicates that Hill had no knowledge of the offer.
The appellant contends that the above-cited testimony creates "some reasonable probability that this offer was not related to [the appellant.]" (Appellant's Rule 32 brief at p. 15.) We disagree. The above testimony does nothing more than create a conflict in the evidence for the trier of fact to resolve. Once again, it is apparent that the trial court resolved the conflicts in testimony adversely to the appellant. We find no reason to disturb that finding on appeal.
Therefore, we find that the trial court properly denied the appellant's Rule 32 petition for postconviction relief.
Based on the foregoing, the judgments of the trial court are due to be, and are hereby, affirmed.
AFFIRMED.
McMillan, Cobb, Baschab, and Fry, JJ., concur.
[1] In his brief to this court, the appellant actually argues that the warrant used to obtain the pistol was defective. However, the pistol was not discovered through a search warrant; it was found in a pond. It is clear that the appellant mistakenly refers to the pistol rather than the shotgun when making this argument.
[2] The appellant does not challenge the trial court's denial of his request for information on any pending juvenile charges; therefore, we do not address the propriety of that ruling.