Ricky Burgin appeals from his conviction of capital murder, see § 13A-5-40(a)(10), Ala. Code 1975. Burgin was tried before a jury on charges that, pursuant *Page 918 
to one scheme or course of conduct, he intentionally killed Fred Williams, Jr., and Sharon Mixon, by shooting them with a firearm and that he intentionally killed Fred Williams, Jr., during the course of committing first degree robbery. Following a guilty verdict on the charge of killing Fred Williams, Jr., and Sharon Mixon pursuant to one scheme or course of conduct, the trial court adjudicated Burgin guilty. Burgin and the State then agreed to waive jury participation in the sentencing hearing, and, with the express agreement of Burgin and the State, the trial court sentenced Burgin to life imprisonment without parole. This appeal follows. We affirm.
In his only assignment of error, Burgin argues that the trial court erred in allowing the prosecution to impeach its own witness and then to offer the impeachment evidence as substantive evidence. Specifically, Burgin argues that the prosecutor was improperly allowed to call as a witness Pearlie Reed, Burgin's girlfriend and the mother of his child, knowing that she was a hostile witness and that she would refuse to testify. Burgin argues that Reed was called as a prosecution witness so that the prosecutor could introduce as impeachment evidence a prior statement of Reed's in which she recounted a confession Burgin had made to her.
Rule 607, Ala.R.Evid., states, "The credibility of a witness may be attacked by any party, including the party calling the witness." Before the adoption of the Alabama Rules of Evidence, Alabama law precluded a party from impeaching his own witness. DeFries v. State, 597 So.2d 742, 748 (Ala.Cr.App. 1992). However, when the testimony of a witness was adverse to the party calling the witness, the trial court could allow that party, either for the purpose of proving surprise or of refreshing the witness's recollection, to question the witness regarding prior inconsistent statements. Hamilton v. State, 520 So.2d 155
(Ala.Cr.App. 1986), aff'd, 520 So.2d 167 (Ala. 1987), cert. denied, 488 U.S. 871 (1988). However, Alabama appellate courts looked for some mention in the record of surprise by the party calling the witness, or a recognizable attempt to refresh the witness's recollection by the calling party, before they would affirm the trial court's decision to allow the party who called the witness to question the witness about prior inconsistent statements, because inconsistent statements could not be used merely to impeach the adverse witness. See Sanders v. State,591 So.2d 119, 120 (Ala.Cr.App. 1991).
With the adoption of Rule 607, Ala.R.Evid., in 1996, a calling party can now impeach its own witness, using "all weapons from the arsenal of impeachment that historically were reserved generally for opposing witnesses." C. Gamble, McElroy's Alabama Evidence, § 165.01(6)(a) (5th ed. 1996). Because there is little Alabama caselaw interpreting Rule 607, we must look to the federal courts' interpretation of Rule 607 of the Federal Rules of Evidence, which is identical to the Alabama rule. We agree with those federal cases that hold that "the right to impeach one's own witness is not absolute and may be held inapplicable due to abuse." C. Gamble, McElroy's Alabama Evidence, § 165.01(6)(b) (5th ed. 1996), citing United States v. Kane,944 F.2d 1406, 1411 (7th Cir. 1991).
 "[Rule] 607 allows the government to impeach its own witness. See Fed.R.Evid. 607. However, `"the government must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony."' United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir. 1990) (quoting United States v. Whitson, 587 F.2d 948, 952-53 (9th Cir. 1978)). Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible. Id. A determination must be made as to whether the government examined the witness for the primary purpose of placing before the jury *Page 919 
substantive evidence which is otherwise inadmissible. Id."
United States v. Gilbert, 57 F.3d 709, 711 (9th Cir.), cert. denied, 515 U.S. 1110 (1995). "It would be an abuse of the rule . . . for the prosecution to call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence . . . ." United States v. Webster, 734 F.2d 1191, 1192
(7th Cir. 1984). However, a prosecutor may call a witness it knows may be hostile, and it may impeach that witness's credibility. Surprise is not a necessary prerequisite to impeaching one's own witness under Rule 607. United States v. Palacios, 556 F.2d 1359 (5th Cir. 1977). Even if the prosecution had reason to believe that a witness would be reluctant to testify, it should not be bound by that knowledge when deciding to call a witness, because "an attorney is entitled to assume that a witness will testify truthfully" once the witness is in a court of law and is under oath. United States v. Patterson,23 F.3d 1239, 1245 (7th Cir.), cert. denied, 513 U.S. 1007 (1994). A prosecutor's decision to call such a witness is subject to a good-faith standard, and it is "always open for the defendant to argue that the probative value of the evidence offered to impeach the witness is clearly outweighed by the prejudicial impact it might have on the jury, [pursuant to Rule 403, Ala.R.Evid.], because the jury would have difficulty confining use of the evidence to impeachment." United States v. Webster, 734 F.2d at 1193.
In the case before us, the prosecutor called Pearlie Reed and, after some preliminary questions, the following occurred:
 "Q [Prosecutor]: At some point in time, Pearlie, during the course of your relationship with [Burgin], and after the incident that occurred in August 1995, did Ricky tell you about that incident? Not easy to do, is it?
"THE COURT: You need to answer the question, please, ma'am.
"Q: Did Ricky tell you about that incident?
"A: Yes.
"Q: Speak up.
"A: Yes.
"Q: What did he tell you about it?
"A: I can't do it.
"Q: You can't do what? You can't do what?
"A: I don't want to.
"Q: You don't want to testify against him?
"A: No.
 "Q: Did Ricky — you will have to answer these questions. Let me ask you this: Do you remember in April of 1996 going to the police and telling the police what happened?
"A: Yes.
 "Q: Or what you knew about the incident? Do you remember doing that?
"A: Yes.
 "Q: And did you tell — I withdraw that. Did you — tell the ladies and gentlemen of the jury what Ricky Burgin told you he did or had to do with this incident? Did he tell you he was there?
 THE COURT: Don't lead the witness, please. Answer the question, please, ma'am.
"A: Yes.
"Q: Yes, what?
 THE COURT: Ask her a direct question. Ask her what he said, if anything.
"Q: Pearlie, what did Ricky say, if anything?
"A: I don't want to testify."
(R. 502-03.) At this point, the trial court instructed Ms. Reed that she had to answer the questions. When she still refused, the jury was excused and the trial judge again instructed Ms. Reed about her obligations as a witness to answer the *Page 920 
questions. When Ms. Reed expressed a desire to invoke her Fifth Amendment rights, the trial court explained to her that, as a witness, she had no liberty interests at stake and that she could not refuse to answer questions on that basis. He then explained to her that she could be held in contempt and incarcerated if she continued to refuse to answer questions. After the trial court gave her some time to consult with the prosecutor, Ms. Reed agreed to answer questions. Back in front of the jury, she was again asked if she had a conversation with Burgin about his involvement in the murders. Ms. Reed responded, "No." (R. 506.) At that point, over the objections of defense counsel on the ground that the prosecutor was impeaching his own witness, the prosecutor began to question Ms. Reed about the particulars of a statement she had made to police investigators. In that statement she told them that Burgin had told her that he and his co-defendants had robbed and killed Fred Williams and Sharon Mixon. Ms. Reed acknowledged that she had voluntarily approached police investigators and had made the statement, but she testified that she had lied and was making parts of it up because she had gotten mad at Burgin, and that other portions of her statement came from "what I had heard" from persons other than Burgin. (R. 507-22.)
During the prosecutor's closing argument, he began to argue as substantive facts the information from Pearlie Reed's statement to the police. When defense counsel objected, the trial court repeatedly sustained the objections, noting that Ms. Reed's statement to the police was not "substantive evidence of the truth of the matter." (R. 731.) During the trial judge's instructions to the jury, he said:
 "During the course of the trial all of these attorneys had the opportunity to ask questions in your presence and to argue their case to you and it's probably apparent to you that they don't agree what the facts are in this case. Perhaps, they don't agree on inferences that you should draw. And that's understandable. But their job is to help you find the truth. And if you find that any argument made by either side is not supported by the evidence as you recall it, then disregard that because the assertions of counsel are not evidence."
(R. 745.) Shortly thereafter, the trial judge instructed:
 "There was a witness asked about a statement made out of court but [she] now denies the truthfulness of it. That evidence is admissible for your consideration as you evaluate the testimony of that witness, but it is not admissible as substantive evidence of the matters now denied."
(R. 747.)
Burgin argues that the prosecutor called Pearlie Reed, knowing she was a hostile witness, as a subterfuge to get before the jury evidence of her statement, which would otherwise be inadmissible hearsay. We do not agree. The record reflects that, while Reed was certainly a reluctant witness who made it clear that she did not want to testify against her boyfriend, she originally answered the prosecutor's questions and, indeed, told the jury that Burgin had related to her that he was present at the murders. It was only after being given an ultimatum by the trial judge — either to answer the prosecutor's questions or to face incarceration — that Ms. Reed changed her story and denied that Burgin had told her about the murders. At that point, the prosecutor was permitted by Rule 607 to question Ms. Reed's credibility by pointing out that she had related to the police a detailed version of the murders that she claimed Burgin had confessed to her. We note that Ms. Reed did not deny telling the police that Burgin had confessed to her his involvement in the murders, but she claimed she had lied to the police because she was mad at Burgin. Because Ms. Reed first told the jury that Burgin had told her he was present at the murder *Page 921 
scene, and then completely changed her story, her credibility became an issue, requiring the prosecutor to impeach his own witness. See United States v. Gilbert, 57 F.3d at 712. Finally, even though the prosecutor tried to argue as substantive evidence of Burgin's guilt the facts he elicited during his impeachment of Ms. Reed, the trial court repeatedly sustained objections to that argument and later gave the jury proper limiting instructions regarding that specific impeachment evidence. A proper limiting instruction is deemed to cure the effects of a prejudicial remark made before a jury. Soriano v. State, 527 So.2d 1367
(Ala.Cr.App. 1988); see United States v. Tafollo-Cardenas,897 F.2d 976, 980 (9th Cir. 1990).
For the foregoing reasons, we hold that the trial court did not err when it allowed the prosecutor to impeach Ms. Reed with a prior inconsistent statement. We commend the trial court for its vigilance in sustaining objections to the prosecutor's attempt to improperly argue that the impeachment evidence was substantive evidence of guilt and for properly instructing the jury on the limited use of the impeachment evidence. The conviction and sentence is due to be, and is hereby, affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.