William COLLINS

v.

STATE of Alabama.

CR–13–1199.

Court of Criminal Appeals of Alabama.

Oct. 23, 2015.

Rehearing Denied Feb. 5, 2016.

Certiorari Denied April 22, 2016
Alabama Supreme Court 1150538.

Susan Graham James, Montgomery, for appellant.

Luther Strange, atty. gen., and Yvonne A.H. Saxon, asst. atty. gen., for appellee.

*On Application For Rehearing*

BURKE, Judge.

This Court's opinion issued on August 14, 2015, is withdrawn, and the following opinion is substituted therefor.

William Collins was convicted of one count of first-degree burglary, a violation of § 13A–7–5 Ala.Code 1975, three counts of first-degree robbery, a violation of § 13A–8–41, Ala.Code 1975, and one count of attempted murder, a violation of §§ 13A–4–2 and 13A–6–2, Ala.Code 1975.

Collins was sentenced to concurrent terms of 30 years' imprisonment for each of his robbery and burglary convictions. For his attempted-murder conviction, Collins was sentenced to a term of 35 years in prison to be served consecutively with the other sentences. Collins filed a motion for a new trial, which was denied. This appeal follows.

On September 14, 2012, while at their house on Monticello Drive in Montgomery, Claud and Cecilia Walker became victims of a home invasion by two black males. Their housekeeper, Joanne Myrick, was also present in the house at the time. Myrick testified that she arrived at the Walkers' house at approximately 8:30 a.m., that morning. Shortly after arriving, she heard the doorbell ring. Through the window Myrick saw a red vehicle and the reflection of a person standing in the front-door area. When Myrick opened the door, a man showed her some flowers, and said that he had flowers for Claud Walker. Myrick told the man "just a minute, let me go get Mr. Walker," and tried to close the door. (R. 87.) The man then pulled the door back, put a gun in Myrick's face, and pushed her back inside the house. He pushed her into a chair and demanded to know where the money was. Myrick told him that she did not know where any money was. Myrick testified that the man "kept telling [her] if you don't tell me where's the money, I'm going to kill you." (R. 88.) The man kept asking about the money, and Myrick continued to tell him that she did not know where any money was. Each time she would respond, he would hit her. During cross-examination, Myrick identified Collins as the man for whom she opened the door. According to Myrick, Collins was not wearing a mask.

While the man was hitting Myrick and demanding that she tell him the location of the money, Myrick saw that another person had stepped inside the door. She could see only from the man's knee down to his feet. She rose up enough to see that the man was wearing what appeared to Myrick to be a mask similar to a mask a doctor wears. Shortly after the other person walked by, Myrick heard Mrs. Walker screaming in her bedroom. After the screams stopped, a man holding a gun brought Mr. Walker out of the office and demanded to know where the money was. He shoved Mr. Walker down on the floor. Mr. Walker got up and went to the bedroom, and the men followed, dragging Myrick with them. When she got to the bedroom, she saw Mrs. Walker unconscious on the floor surrounded by blood. Myrick thought that Mrs. Walker was dead. One of the men placed Myrick on the floor next to Mrs. Walker while the other man searched the house and went through the Walkers' belongings. The other man stood over the victims pointing the gun at their heads, threatening to kill them. He asked Mr. Walker for his rings, and ordered Myrick to remove a ring from Mrs. Walker's finger. Mr. Walker was taken to the closet where the safe was. Soon after Mr. Walker opened the safe, the men heard an alarm and fled the home.

Cecelia Walker testified that on the morning of the home invasion she was getting ready to take a bath when she heard her housekeeper scream. Mrs. Walker started toward the family room but was met by a black male in the hall. He had a pistol and started beating her head. Mrs. Walker testified, "I had my glasses on, and he beat my glasses off of me. He broke my nose with the pistol." (R. 116.) The man directed Mrs. Walker to lie down on the floor, and she lost consciousness. Following the invasion, Mrs. Walker was transported to the hospital. All the bones in her face were broken. She required 200 stitches in her head and stayed in the hospital for 5 days. As a

result of the assault, Mrs. Walker suffers from memory loss.

Claud Walker testified that he was sitting at his desk talking to his daughter on the telephone when a black male entered the room holding a gun. According to Mr. Walker, the man who came into his room was not wearing a mask. (R. 121–22.) The man told Mr. Walker that he was going to kill him if Mr. Walker did not show him where the money was, and he knocked the phone out of Mr. Walker's hand. Mr. Walker stood up and began going through his desk drawers. He pulled out some items and threw them on the floor. The man took some items and then put the gun to Mr. Walker's head and demanded to know where the money was. He said, "If you don't tell me, I'm going to kill you right here." (R. 131.) Mr. Walker told the man that he did not know what money the man was referring to but that he had a small amount of money in his safe in his bedroom. The man pushed Mr. Walker down the hall to the bedroom. When Mr. Walker went into the bedroom he saw his wife lying in a pool of blood. Mr. Walker testified, "She looked like she was dead." (R. 134.) The man kept pushing Mr. Walker with the gun to his head, repeating "I'm going to kill you; I'm going to kill you if you don't show me that money." (R. 134.) Mr. Walker went to the safe in the closet and opened it. The safe contained three $100 bills. The man took the money and ordered Mr. Walker back into the bedroom to lie down beside Mrs. Walker and Myrick. The man told the other man inside the house to watch them because he wanted to check something. While that man went to the other room, the man who remained to watch over the victims said, "[W]e're going to kill you." (R. 135.) As the victims lay there, an alarm sounded. One of the men asked what the alarm was, and Mr. Walker responded, "[W]hen your partner knocked that phone out of my hand in the office in there, I had been talking to my daughter, and I'm sure she's called the police by now, and we're expecting them any minute." (R. 135.) The men then fled the residence.

Officer M.D. Byner, currently with Hoover Police Department, but who was working for the Montgomery Police Department at the time of the robbery, testified that he heard a dispatch that a home-invasion robbery involving two black males had just occurred and that the men had left the scene in a red minivan. On a hunch, Officer Byner traveled toward the Troy Highway from his location. Soon thereafter, Officer Byner noticed a red minivan, occupied by two black males, traveling at a high rate of speed. Officer Byner activated his patrol lights. The driver of the minivan pulled into a driveway, and Officer Byner advised the driver to pull back onto the main road. After a backup unit arrived, Officer Byner approached the driver's side of the vehicle while the other officer approached the passenger's side. As the officers approached, the driver sped away. The officers retreated to their respective vehicles and pursued the minivan. The driver turned into Virginia Meadows Apartments and, near the entrance, both men got out of the van and ran. The officers pursued them, and Officer Byner was able to catch the passenger and take him into custody; however, the driver got away.

The passenger was identified as Elton Walton. Officer Byner entered the tag number on the van into a database, but the result indicated that the tag was registered to a different van that belonged to a church. The emblems on the van, which displayed the make and model of the vehicle, were covered with black tape. Further testimony would reveal that Collins's fingerprints were found on the tape recovered from the van. Officer Byner asked

Walton who the driver was, and Walton said that Collins was the driver. When Officer Byner initiated the stop, the van had pulled into a driveway next door to Collins's parent's house.

Elton Walton testified that on September 14, 2012, Collins telephoned him early that morning asking him if he was ready to go rob the Walkers. According to Walton, the men had discussed robbing the Walkers for approximately three weeks prior to the robbery. Walton testified that Collins was familiar with the Walkers because Collins's uncle had built a deck for the Walkers and Collins had worked for his uncle. Walton got out of bed and waited on Collins to come get him. A short time later, Collins knocked on Walton's door. After the men left Walton's residence, they went to Collins's house. They sat for awhile and then Collins asked Walton if he was ready and to get the book bag that contained zip ties and a crow bar. They also got some flowers as a ploy to get inside the Walkers' house. While Walton sat in Collins's mother's red minivan, Collins duct-taped the minivan attempting to hide the make and model of the van. Collins also changed the tag on the minivan before driving them to the Walkers' house. Walton testified that he knocked on the door while Collins remained inside the mini van. Walton stated that Myrick came to the door and that he pushed her back inside. According to Walton, Collins then entered the residence, and went to another room where he struggled with Mrs. Walker. Walton demanded that Myrick tell him where the money was, and he hit her several times. Collins got Mr. Walker from his office and eventually went to Mr. Walker's safe. Walton demanded money and a ring from Mr. Walker. He held his gun on the three victims while Collins rummaged through the back part of the house. When Collins came from the back of the house, they got into the minivan and left. They were going to Collins's moth-

er's house when Officer Byner got behind them and pulled them over. Walton testified that they stopped the vehicle but ultimately ran away. The officers pursued them and ultimately apprehended Walton. Walton, who had been shot with a taser gun during the chase, was taken to the hospital where Mr. Walker identified him as one of the assailants who had entered his residence.

Detective G.A. Schnupp with the Montgomery Police Department testified that on September 14, 2012, he was asked by Detective A.D. Gorum to respond to 4100 Fitzpatrick Boulevard, Virginia Meadows Apartments, in reference to a pursuit of a vehicle where the subjects had bailed from the vehicle and been apprehended. (R. 291.) Detective Gorum wanted Detective Schnupp to go to the scene, to photograph the vehicle, and to read the subject in custody his rights. When Detective Schnupp arrived at the scene he saw multiple patrol units surrounding a red minivan. He noticed that the emblems on the back, side, and front of the minivan were covered with duct tape. (R. 292.) Detective Schnupp entered the tag number into a database which showed that the tag did not belong to the vehicle. The tag on the van belonged to a different van registered to St. James Baptist Church Holt Crossing. Later testimony revealed that Collins's father, Willie Collins, served as a deacon at that church. The tag that should have been on the van reflects that the 2005 red, Saturn Relay minivan is registered to Collins's father.

A silver revolver was found on the driver's side floorboard of the minivan. On the passenger's side floorboard was a hundred-dollar bill, an envelope, and a watch and wallet with photo identification belonging to Mr. Walker. A blue respirator mask and a cigarette pack were in the center console. A black book bag was

found on the back floorboard; in the book bag were zip ties, a gun clip with rounds, and a crowbar. Underneath the back passenger's seat was a black semiautomatic handgun. A bouquet of flowers was also found on the rear floorboard of the vehicle. DNA found on the silver revolver was tested and matched the DNA of Mrs. Walker. A fingerprint was found on the tape covering the emblems of the van, and the fingerprint was determined to belong to Collins.

Detective A.E. Magnus with the Montgomery Police Department testified that a search of Collins's residence revealed black duct tape as well as a cellular telephone belonging to Collins. When Detective Magnus inspected the telephone, he discovered that the phone had been used to conduct Internet searches for Claud Walker.

The defense called several witnesses at trial. One witness, Detective Magnus, testified that, according to cellular telephone records, Walton attempted to call Collins a few times the morning of the robbery, at 7:49 a.m., at 8:00 a.m., and again 40 seconds later. Walton's fourth call was accepted. Detective Magnus also testified that in Walton's statement to the police, contrary to his testimony at trial, Walton had said that it was Collins who went to the door with the flowers and who had pushed Myrick. (R. 588.) Walton also told the police that Walton had the black gun and that Collins had the silver revolver. (R. 590.)

The defense called Walton back to the stand. Defense counsel asked Walton: "Have you ever made a statement to Mr. Collins that folk protect folk or disciples protect disciples, that that's why you were doing—testifying in this case the way you have against Mr. Collins?" (R. 598) Walton admitted to being a member of a street gang called the "Disciples," but testified that the gang had nothing to do with "this." (R. 599.)

Collins testified on his own behalf. He testified that on the morning of September 14, 2012, he was supposed to pick up his mother and take her to work in her van. The day before he had talked to Walton and that they were supposed to go to turn in an application at a temporary employee service. Collins stopped by Walton's house before he went to pick up his mother to see if Walton was still going. According to Collins, Walton did not have a telephone so Walton would occasionally come to Collins's house to use his telephone. Collins testified that Walton used the Internet on the telephone to check his social-media sites.

Collins further testified that, on the morning of September 14, he took his mother to work and went back home. Collins saw that Walton had telephoned him so Collins went to Walton's apartment. When Collins arrived, Walton was standing outside in the parking lot. According to Collins, Walton was with a male to whom he introduced Collins as his cousin, "Q." Walton and Q asked Collins to take them to a house off Bell Road. Collins initially agreed but then changed his mind after seeing that Walton had a gun. He told them that they would have to find another ride over to the house. Collins testified that Walton convinced him to let Walton use the van, and the men dropped Collins off at the Bell Road YMCA around 8:45 a.m. About 30 to 45 minutes later, Walton came back to pick Collins up. Walton was alone so Collins assumed that Walton had dropped Q off at his girlfriend's car at the Winn Dixie grocery store on the Atlanta Highway. When Collins got in the driver's seat of the van, he noticed a lot of debris and trash all over the floor and a revolver lying on the floor. Collins asked what had happened to the

van, and Walton responded that Collins needed to get the van off of the road. Walton's shirt was unbuttoned, he was sweating, and he appeared nervous. Walton told him that his cousin had "flipped out." (R. 646.)

Walton wanted Collins to take him to his apartment, but Collins told him that he was going to take the van back to his mother's house and that they were just going to have to part ways from there. Collins testified that he pulled into the driveway next door to his mother's house because Walton was panicking and that he drove away after being stopped by police because he was scared. According to Collins, Walton was in the passenger's seat holding a black handgun, and, at the time, he thought Walton might try to have a shootout with the police. After he drove off, he turned onto the first street to the right because, Collins testified, "I wasn't really trying to go on a run, you know in the car from the police. . . . So I turned into the Fitzpatrick Boulevard into those apartments, and I jumped out of the car . . . and ran from everything, the situation, the police officer, [Walton], the whole thing." (R. 650.) Collins hid in a shed in his back yard for several days before he turned himself in to the police.

Collins testified that there was a tag in the van that was registered to a van belonging to his father's church but that he did not realize that the tag belonged to the other van. He thought that the tag was an older tag for his mother's minivan. Collins denied that he put the tag on and claimed that Walton and Q must have put the tag on the van after they dropped him off at the YMCA. Collins testified that he thought Walton and Q were going to fight with someone over money so he put the duct tape over the emblems of the van so there would not "be any retaliation if the guy got into a fight with whose house we

went to whether my parents were driving the van or if I was driving the van." (R. 654.)

On appeal, Collins argues that the evidence was insufficient to corroborate the testimony of Walton—his accomplice—and was therefore insufficient to support his conviction for attempted murder.[1] Collins also contends that the trial court erred when it denied his attempt to impeach Walton's credibility through the use of extrinsic evidence. We will address each argument in turn.

## I.

■ According to Collins, the evidence was insufficient to support his conviction for attempted murder because, he says, Walton's testimony lacked the requisite corroboration. Under Alabama law, "[a] conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient." § 12–21–222, Ala.Code 1975. In *Jackson v. State*, 98 So.3d 35, 40 (Ala. Crim.App.2012), this Court held:

> " ' "The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense." ' *Ex parte Bullock*, 770 So.2d 1062, 1067 (Ala.2000)(quoting *Andrews v. State*, 370 So.2d 320, 321 (Ala.Crim.App.1979), citing in turn *Miller v. State*, 290 Ala. 248, 275 So.2d 675, 677 (1973)).

---

1. Collins does not challenge his other convictions on this ground.

"To corroborate has been defined by this Court as ' "to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony." ' *Kuenzel v. State,* 577 So.2d 474, 518 (Ala.Crim.App.1990) (citations omitted). 'While corroborating evidence need not be strong, it "... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt." ' *Booker v. State,* 477 So.2d 1388, 1390 (Ala.Crim.App.1985) (quoting *McCoy v. State,* 397 So.2d 577 (Ala. Crim.App.1981)). The corroboration does not need to be sufficiently strong on its own to warrant a conviction, but it must tend to connect the defendant to the crime. *Miles v. State,* 476 So.2d 1228, 1234 (Ala.Crim.App.1985). As this Court has repeatedly explained, ' "[c]orroboration need only be slight to suffice," ' *Stoinski v. State,* 956 So.2d 1174, 1182 (Ala.Crim.App.2006)(quoting *Ingle v. State,* 400 So.2d 938, 940 (Ala.Crim. App.1981))."

In the present case, there was ample evidence to corroborate Walton's testimony. Joanne Myrick testified unequivocally on cross-examination that Collins was the man for whom she opened the door. (R. 108–09.) Myrick stated that Collins was wearing a blue shirt and that his face was not covered. Myrick also testified that she "probably did tell the police" that Collins was armed with a silver handgun. (R. 105.) Additionally, Mrs. Walker testified that the man who pistol-whipped her was armed with a "silver-colored pistol." (R. 115.) Accordingly, the State presented evidence independent of Walton's testimony establishing that Collins forcefully entered the residence, assaulted Myrick, and severely beat Mrs. Walker with a pistol.

Aside from that eyewitness testimony, police officers testified that Collins's fingerprints were found on the tape that was used to obscure the make and model of the vehicle used during the crime. Additionally, officers testified that black tape was found at Collins's residence as well as Collins's cellular telephone that had been used to conduct Internet searches for Claud Walker. (R. 387.)

Thus, even if Walton's testimony is eliminated, there remains overwhelming incriminating evidence demonstrating not only that Collins was an active participant in the home invasion, but also that it was Collins who forced entry into the house, beat Myrick, and attempted to kill Mrs. Walker by repeatedly striking her with his silver pistol. Accordingly, there was sufficient evidence to corroborate Walton's testimony, and the trial court did not err when it denied Collins's motion for a judgment of acquittal.

## II.

Next, Collins argues that the trial court erred when it denied defense counsel's attempt to impeach Walton's credibility through the testimony of a fellow inmate. During the defense's case, counsel sought to call Marvin Gaston to the witness stand. While in a holding cell in the county jail, Gaston had allegedly overheard a conversation between Collins and Walton in which Walton suggested that he was implicating Collins in order to protect a fellow gang member. Defense counsel proffered Gaston's testimony outside the presence of the jury. When asked about what he had overheard while in a cell with Collins and Walton, the State objected on the ground that the testimony was hearsay. Defense counsel stated, "Judge, I apologize, but I will just—we'll just have to put the other witness on first, and then we'll bring [Gaston] back in for impeachment." (R. 585.)

Defense counsel then called Walton back to the stand and asked Walton if he was trying to protect someone. Walton denied the assertion. Defense counsel then asked, "Have you ever made a statement to Mr. Collins that folk protect folk or disciples protect disciples, that that's why you were doing—testifying in this case the way you have against Mr. Collins? Have you ever made that statement?" (R. 598.) Walton responded that his gang, the Disciples, did not have anything to do with "this." (R. 599.)

Later that evening of trial, the parties and the trial court held a lengthy discussion regarding whether Gaston's testimony would constitute inadmissible hearsay. (R. 621–29.) Collins's position was that Gaston's testimony was not hearsay because it was being offered only to impeach Walton's credibility. However, the trial court disagreed and stated its belief that Gaston's testimony was hearsay because it was being offered for the truth of the matter asserted.

At the conclusion of all the testimony presented by Collins, the defense rested, subject to making a proffer of Gaston's testimony. Outside the presence of the jury, defense counsel called Gaston to the stand. Gaston testified that while he was in a holding cell in the county jail he observed Collins ask Walton why Walton had implicated Collins in the offenses even though Collins was not there. Gaston testified that Walton responded that "disciples don't betray disciples." (R. 696.) Following this testimony, defense counsel again renewed her request that Gaston be allowed to testify to those facts. The trial court denied the request on the grounds that Gaston's testimony was hearsay.

■ Contrary to the trial court's finding, an inconsistent statement by a witness who is not a party, whether testified to by the witness during questioning or proven extrinsically through another witness, generally operates to impeach or discredit the witness and is not substantive evidence of the matter asserted. The statement is being offered merely to show the inconsistency, and, thus, the statement is definitionally nonhearsay. *See* Charles W. Gamble and Robert J. Goodwin, *McElroy's Alabama Evidence* § 157.02(1)(6th ed.2009). *See also* Rule 801(c), Ala. R. Evid. The statement is being offered to prove that the witness said something in the past that is inconsistent with what the witness now states. As such, it is recommended that the trial court give jury instructions that the inconsistent statement is to be considered only for the limited purpose of impeachment and not as evidence of the truth of the matter stated therein. *Id.* We acknowledge that some inconsistent statements may constitute substantive evidence as to the truth of the matter asserted in them; however, those statements must meet certain requirements. Usually these statements must be an admission or must have been given under oath subject to penalty of perjury at a trial, hearing, or other proceeding. *Id.* In those situations, the inconsistent statement can be used as both impeachment and substantive evidence.

■ In this case, defense counsel was attempting to impeach Walton with a prior inconsistent statement by having Gaston testify as an impeaching witness. The statement was not being offered to prove the truth of the matter asserted, i.e., that "disciples don't betray disciples." Rather, it was being offered to prove that Walton made the statement and that the statement was inconsistent with his testimony at trial. Accordingly, the statement did not meet the definition of hearsay. *See* Rule 801(c), Ala. R. Evid. (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted.").

We note that this Court has held that " ' "[i]mpeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible" ' " *Smith v. State,* 745 So.2d 922, 934–36 (Ala.Crim.App.1999), quoting *Burgin v. State,* 747 So.2d 916, 918 (Ala.Crim.App.1999), quoting in turn *United States v. Gilbert,* 57 F.3d 709, 711 (9th Cir.), cert. denied, 515 U.S. 1110, 115 S.Ct. 2264, 132 L.Ed.2d 269 (1995). Additionally, this Court noted that "[a]lthough Rule 607, Ala. R. Evid., permits a party to impeach his own witness, ' "the right to impeach one's own witness is not absolute and may be held inapplicable due to abuse." ' " *Smith,* 745 So.2d at 935, quoting *Burgin,* 747 So.2d at 918, quoting in turn C. Gamble, *McElroy's Alabama Evidence,* § 165.01(6)(b) (5th ed.1996). Based upon the record before us, it would be conjecture for this Court to find that Collins was abusing Rule 607, Ala. R. Evid., for the sole purpose of introducing otherwise inadmissible hearsay. Simply because impeachment evidence may tend to bolster a party's theory of the case does not automatically render it inadmissible under the rationale in *Smith.*

However, Gaston's testimony was inadmissible on other grounds. It is well settled that "this Court will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected by the trial court." *A.G. v. State,* 989 So.2d 1167, 1180 (Ala.Crim.App.2007), quoting *Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs., Found., P.C.,* 881 So.2d 1013, 1020 (Ala.2003).

"When a witness, on cross-examination, denies having made a statement out of court which is inconsistent with the witness' testimony on direct examination, the only available move for the impeaching party is to bring on extrinsic proof—either in the form of writing, tape recording or impeaching witness who can testify as to the prior inconsistent statement. Before such extrinsic evidence may be elicited, however, it is the general rule that the impeaching party must lay a proper predicate by asking the witness being impeached whether such a statement was made, specifying with reasonable certainty the time, the place, the person to whom such supposed statement was made and the substance of the statement. The witness likewise must be given an opportunity to admit or deny having made the statement. This foundational requirement is continued under the Alabama Rule of Evidence:

"'Rule 613. Prior Statements of Witnesses.

" ' . . . .

" '(b) Extrinsic evidence or prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or deny having made it. . . .' "

Charles W. Gamble and Robert J. Goodwin, *McElroy's Alabama Evidence* § 157.01(1)(b)(6th ed.2009) (footnotes omitted).

Here, defense counsel asked Walton, "Have you ever made a statement to Mr. Collins that folk protect folk or disciples protect disciples. . . ." (R. 598.) Walton denied making such a statement and said that his gang did not have anything to do with the case. Thus, Walton was confronted with the inconsistent statement. However, defense counsel failed to provide Walton with any additional information re-

garding the particular circumstances under which the statement was allegedly made. Walton was not confronted with the time nor the place of the statement. Defense counsel's general question lacked the specificity necessary to put Walton on notice of the alleged inconsistent statement.

> "The basic reason for the requirement that the predicate question specify time, place, content of the supposed statement, and the person to whom made, is to enable the faculties of the mind of the witness to be put in motion with memory aided by the train of ideas which such circumstances would be likely to suggest in reference to the subject matter under inquiry and thereby be aided in recalling to memory whether the witness made the statement; and, if the witness recalls making it, to give an explanation of the apparent conflict between the witness' testimony and such prior statement. In a word, the requirement is a matter of fairness."

Gamble and Goodwin, *McElroy's Alabama Evidence* § 157.01(2)(footnote omitted). Because defense counsel failed to lay the required predicate when confronting Walton with his prior statement, Gaston's testimony was properly excluded.

■ Moreover, we find that even if the trial court had erred in excluding Gaston's testimony, that error would have been harmless. Rule 45, Ala. R.App. P., provides:

> "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear

that the error complained of has probably injuriously affected substantial rights of the parties."

While recognizing the importance of a witness's credibility, we cannot say that the State's case hinged on Walton's credibility. As noted in the previous section, the State presented substantial evidence indicating that Collins was involved in planning the robbery by searching for information about Mr. Walker on his cellular telephone and by using tape to conceal the make and model of the vehicle used in the crime. The State also presented eyewitness testimony from the victims of the crime indicating that Collins came to the door, forced his way in, and repeatedly struck Mrs. Walker with his pistol. At trial, Joanne Myrick identified Collins as the man who forced his way into the Walkers' home.

Police officers also testified that Collins was driving the vehicle after the crime and that, when pulled over, he sped away and ultimately ran from the pursuing officers. Collins stated that he hid in a shed for several days after the crime before turning himself in. Additionally, the license plate on the van had been stolen from a van that was registered to a church at which Collins's father was a deacon. Based on the totality of the evidence presented at trial, we cannot say that the trial court's exclusion of Gaston's testimony "probably injuriously affected [Collins's] substantial rights...." *See* Rule 45, Ala. R.App. P.

Based on the foregoing, the judgment of the trial court is affirmed.

APPLICATION FOR REHEARING GRANTED; OPINION OF AUGUST 14, 2015, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.

WELCH and KELLUM, JJ., concur in the result. WINDOM, P.J., concurs in part and concurs in the result in part.

JOINER, J., concurs in part and concurs in the result in part, with opinion, in which WINDOM, P.J., concurs.

JOINER, Judge, concurring in part and concurring in the result in part.

I concur with the main opinion as to Part I. As to Part II, however, I concur only in the result.

In Part II of the main opinion, this Court correctly sets out the relevant facts and also correctly frames William Collins's argument on appeal—specifically, Collins's argument "that the trial court erred when it denied defense counsel's attempt to impeach [Elton] Walton's credibility through the testimony of a fellow inmate." 206 So.3d at 689. In addressing this argument, the main opinion agrees with Collins's position and concludes that the circuit court erred when it did not allow Collins to present Gaston's testimony as a means of "impeaching" Walton's testimony.

Although the main opinion correctly summarizes common rules of law regarding the use of both impeachment evidence and hearsay, our caselaw also recognizes that a trial court has the discretion to exclude evidence proffered for "impeachment" if the proffered evidence is actually an improper attempt to admit as substantive evidence otherwise inadmissible hearsay. The record in this case clearly demonstrates such a situation.

Specifically, as the main opinion explains, the record on appeal demonstrates that Collins's defense theory at trial was that Walton and Walton's cousin, "Q," committed the charged offenses—not Collins. To support this theory, Collins questioned Walton—both during the State's case-in-chief and again when he recalled Walton during the defense's case—about whether Walton had made a statement to Collins that Walton was only implicating Collins to protect Q. Walton denied ever having made such a statement and also

denied that he was trying to "protect someone." (R. 598.) Thereafter, Collins "sought to call Marvin Gaston to the witness stand," who

"had allegedly overheard a conversation between Collins and Walton in which Walton suggested that he was implicating Collins in order to protect a fellow gang member. Defense counsel proffered Gaston's testimony outside the presence of the jury. When asked about what he had overheard while in a cell with Collins and Walton, the State objected on the ground that the testimony was hearsay."

206 So.3d at 689. Collins argued that Gaston's testimony was not hearsay; rather, he contended that it was being offered "for impeachment and to establish bias that Mr. Walton has come up here and he has said things that were not true when, in fact, his bias is that he is protecting people." (R. 624.) The circuit court disagreed with Collins's argument and excluded Gaston's testimony, explaining:

"*But that statement is being offered for the truth of the matter asserted.* That is exactly why it's being offered. And I'll tell you why I know it even more. *Because you want them to hear exactly what he said. That's the importance of it.* Okay. Because if it wasn't, you would say, you're right. Judge, is all we need to show is there was a conversation. A gang sign was thrown. We're good with that. *But you want the content of that conversation getting before that jury because that's exactly why you need it. It's for the truth of the matter asserted. And that is total hearsay.*"

(R. 625 (emphasis added).) In other words, the circuit court determined that Collins's so-called impeachment evidence was, in fact, an improper attempt to admit as substantive evidence otherwise inadmissible hearsay.

In deciding to exclude Gaston's testimony, the circuit court properly exercised its discretion when it determined that Gaston's proffered testimony was not being used merely to "impeach" Walton, and was, instead, an improper attempt to introduce hearsay evidence that was otherwise inadmissible in order to bolster Collins's defense theory—i.e., that Q helped Walton commit the charged offenses and that Walton was "covering" for Q. Indeed, as noted above, our caselaw recognizes that, although the Alabama Rules of Evidence provide a party the right to impeach a witness, circuit courts have the discretion to limit that right in cases where a party uses "impeachment evidence" as a guise to introduce otherwise inadmissible hearsay. *See, e.g., Smith v. State,* 745 So.2d 922 (Ala.Crim.App.1999) ("Although Rule 607, Ala. R. Evid., permits a party to impeach his own witness, ' "the right to impeach one's own witness is not absolute and may be held inapplicable due to abuse." ' *Burgin v. State,* 747 So.2d 916, 918 (Ala.Cr. App.1999), quoting C. Gamble, *McElroy's Alabama Evidence,* § 165.01(6)(b) (5th ed.1996).").

In *Smith,* Smith was charged with capital murder and attempted murder.

"At trial, [Smith] called Charles Cottrell to testify for the defense. After asking Cottrell the standard questions— e.g., his name and address—defense counsel immediately began questioning Cottrell in line with the defense's theory that Cottrell had a weapon on the night of the shooting and that he was firing it at the Prism. Cottrell denied having a weapon on the night of the shooting. Defense counsel then questioned him about an alleged conversation he had had with [Hosea] Atchison, in which he allegedly told Atchison that he did have a gun on the night of the shooting. Cottrell denied having had any such conversation with Atchison. The defense then attempted to call Atchison to testify as to the alleged conversation with Cottrell. The state objected, and the trial court sustained the objection."

*Smith,* 745 So.2d at 934. On appeal, Smith argued that the circuit court erred when it did not allow Smith to present Atchison's testimony to "impeach" Cottrell. This Court affirmed the circuit court's decision to exclude that testimony, holding:

"Rule 613, Ala. R. Evid., ... states, in pertinent part:

" '(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or to deny having made it.'

"Looking at this rule, standing alone, one might conclude that Atchison's testimony might be admissible to impeach Cottrell's testimony. However, ... *the rules of evidence do not operate in a vacuum.* Although Rule 607, Ala. R. Evid., permits a party to impeach his own witness, ' "*the right to impeach one's own witness is not absolute and may be held inapplicable due to abuse.*" ' *Burgin v. State,* 747 So.2d 916, 918 (Ala.Cr.App.1999), quoting C. Gamble, *McElroy's Alabama Evidence,* § 165.01(6)(b) (5th ed.1996).

"In *Burgin,* this court was persuaded by the federal courts' interpretation of Rule 607 of the Federal Rules of Evidence, which is identical to the Alabama Rule:

" ' "[Rule] 607 allows the government to impeach its own witness. See Fed.R.Evid. 607. However, ' "the government must not knowingly elicit

testimony from a witness in order to impeach him with otherwise inadmissible testimony." ' *United States v. Gomez–Gallardo*, 915 F.2d 553, 555 (9th Cir.1990)(quoting *United States v. Whitson*, 587 F.2d 948, 952–53 (9th Cir.1978)). *Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible. Id.* A determination must be made as to whether the government examined the witness for the primary purpose of placing before the jury substantive evidence which is otherwise inadmissible. *Id.*" '

"*Burgin*, 747 So.2d at 918, quoting *United States v. Gilbert*, 57 F.3d 709, 711 (9th Cir.), cert. denied, 515 U.S. 1110, 115 S.Ct. 2264, 132 L.Ed.2d 269 (1995). As this court stated in *Burgin*, ' "*[i]t would be an abuse of the rule . . . for the prosecution to call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence.*" ' *Id.*

"*The rules limiting the prosecution's ability to impeach prosecution witnesses are equally applicable to the defense. Thus, although the defense may impeach its own witness, it may not do so solely for the purpose of introducing otherwise inadmissible evidence.*"

*Smith v. State*, 745 So.2d 922, 934–36 (Ala. Crim.App.1999) (emphasis added).

Here, like in *Smith*, when Collins called Walton to testify, Collins's questioning of Walton focused primarily on Walton's gang affiliation and whether Walton was implicating Collins to protect his cousin because his cousin was also a gang member. Additionally, although he argued that Gaston's testimony was being offered to impeach Walton's testimony, Collins admitted that the purpose for introducing Gaston's testimony was to demonstrate that Walton's "bias is that he is *protecting people*." [2] (R. 624 (emphasis added).) In other words, the purpose of introducing Gaston's testimony was to present evidence to bolster Collins's defense theory.

Based on the record in this case, "it is obvious that the defense's sole purpose for calling [Walton] to testify was to have him deny making the statement so that the defense could then seek to introduce the statement into evidence under the guise of impeachment" and "[s]uch a statement would be blatant hearsay that otherwise would have been inadmissible." *Smith*, 745 So.2d at 935–36. Indeed, Collins was clearly attempting to present inadmissible hearsay through the guise of introducing that testimony as "impeachment evidence" and was doing so " 'in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence.' " *Burgin v. State*, 747 So.2d 916,

---

**2.** On appeal, Collins reasserts his claim that Gaston's testimony would establish Walton's bias. Collins's proffer of Gaston's testimony, however, clearly demonstrates that Collins was not using Gaston's testimony to establish bias; rather, Collins was attempting to impeach Walton's testimony by presenting extrinsic evidence of a prior inconsistent statement.

In *Smith*, we addressed this exact issue. Specifically, we explained:

"First, we note that Rule 616, Ala. R. Evid., is inapplicable here. Rule 616 states

that evidence of bias, prejudice, or interest on the part of a witness is admissible to attack the witness's credibility. However, this is not a case in which the defense was seeking to show bias. It is clear from defense counsel's offer of proof as to Atchison's proposed testimony that the purpose of the testimony was to prove, through extrinsic evidence, a prior inconsistent statement made by Cottrell, not to prove bias. Thus, Rule 616 is inapplicable."

745 So.2d at 934. Likewise, Rule 616, Ala. R. Evid., is inapplicable here.

919 (Ala.Crim.App.1999) (quoting *United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984)). Such an abuse of the rules of evidence is improper; thus, unlike the main opinion, I would conclude that the circuit court did not abuse its discretion in excluding Gaston's proffered testimony.

Because the main opinion concludes that the circuit court's decision to exclude Ga-ston's testimony was, at worst, harmless error, I concur in the result as to that part of the opinion.

WINDOM, P.J., concurs.